[No. S004352, Crim. No. 21753. Oct. 3, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD GRIFFIN, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Julia Cline Newcomb, Deputy State Public Defender, and Richard L. Phillips for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Joel Carey, Edmund D. McMurray, Michael J. Weinberger and George M. Hendrickson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BROUSSARD, J.**—Defendant Donald Griffin was convicted in the Superior Court of Fresno County (Meyers, J.) of the murder of Kelly W. (Pen. Code, § 187) and the jury found true special circumstance allegations that the murder was committed in the course of rape (Pen. Code, § 190.2, subd. (a)(17)(iii)), sodomy (Pen. Code, § 190.2, subd. (a)(17)(iv)), and a lewd act on a child (Pen. Code, § 190.2, subd. (a)(17)(v)). Defendant was also convicted of rape (Pen. Code, § 261, subds. (2) and (3)), sodomy (Pen. Code, § 286, subd. (c)), and a lewd act on a child (Pen. Code, § 288), and the jury found true an allegation that defendant had used a knife in the commission of the murder (Pen. Code, § 12022, subd. (b)). The appeal to this court is automatic.

We affirm the defendant's convictions and the special circumstances findings. We reverse the penalty determination because of *Ramos* error (*People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430].)

### SUMMARY OF EVIDENCE

Defendant conceded that he had killed his stepdaughter, 12-year-old Kelly W., but denied any sexual assault. The prosecution evidence was that defendant stopped by his wife's workplace in Kerman, California, about 7 p.m. on December 13, 1979, along with Kelly. He said they were going to his parents' house nearby, and they left. A few minutes after 10 p.m. he returned, saying that he had allowed Kelly to leave his parents' house for home in the company of a little girl wearing horn-rimmed glasses, but that Kelly had never returned home. He made several expeditions in search of Kelly during the evening and repeated this story of her disappearance. He reported to the police that Kelly was missing, that she had left in the company of a little Mexican girl wearing glasses. He said to several witnesses that if anyone had hurt Kelly, he would kill them.

When the police received a radio report that an injured person had been found on a nearby rural road, they asked defendant to follow them to the police station. An officer coming on duty saw defendant in a cell latrine, on his tiptoes, straddling a washbasin, with his hands in front of him. The officer could not see what defendant was doing, as his back was facing the officer. When defendant turned around, he asked for paper towels, and dried his hands. The officer saw that defendant had a buck knife in a holster at his waist. Defendant went out again to search for Kelly. He returned to the police station later that night, wearing clean pants and a different jacket. An officer observed some spots of blood on his boots, and defendant said

that they were oil spots and tried to wipe them off. The officer asked where defendant's knife was, and he said he had lost it during his search for Kelly.

The victim's body was discovered that night on the side of a rural road. The blouse and sweater were pulled up partially over her face, the back of her bra was torn, the left shoulder strap had been torn loose, and one of the cups had been cut with a knife. The left leg was bent at an awkward angle, and the underwear and pants were pulled down below the hips. The left leg of the underwear was cut through. The pants were torn and had also been cut near the zipper. There were stab wounds in the neck and abdominal incisions from the pubic bone to the breast bone, exposing the internal organs. There was a large pool of blood nearby, and a bloody partial footprint. An officer returning from the scene thought that the print matched defendant's boots. An officer went out into the police parking lot and shone a light into the truck defendant had been driving all evening; there was blood on the floorboard on the driver's side and another bloody footprint which looked like the one at the scene and looked like it could have been made by defendant's boots. Later analysis of the blood in the truck showed that it was the victim's unique blood.

After defendant's arrest, he said, "I think I need a psychiatrist." Then on his way from the crime lab to booking, he said to an officer, "Do you think I'll get 10 years for this?" When an officer took defendant out of his cell after the arrest, defendant said, "Go ahead man, it's all right, why don't you just go ahead and kill me. It's all right, just go ahead and kill me." To the officer transporting him from Kerman to Fresno, defendant said, "Give me your shotgun so I can blow my head off. I'm a fool."

Dr. Nelson performed the autopsy and testified that the cause of death was strangulation and severing of the carotid artery. The abdominal incision occurred after death. It was his opinion that there had also been a rape and an act of sodomy. The hymen was partly torn and there was a little bleeding near the tear. There was also a small bruise near the opening of the vagina and a bruise of an inch and a quarter to an inch and a half near the tear in the hymen. This testimony was impeached with prior inconsistent statements; in his autopsy report Dr. Nelson had not mentioned any bleeding near the tear in the hymen, and had described the bruise near the tear as much smaller. He explained that the shape of the bruise had become clearer after the tissue had been fixed in formaldehyde.

Dr. Nelson also testified that the anus was quite dilated, and he thought it had been stretched so far that it could not close. This testimony was impeached with his prior inconsistent statements; in his autopsy report he said the anus was somewhat "prominent." He explained at trial that this was a

nicer word than dilated. At the preliminary hearing he said that the anus was somewhat dilated. He explained that he was not very precise in his speech. The doctor also testified that he took a fluid sample from the anus which showed no sperm, but which in his opinion showed the presence of prostatic acid phosphatase.

Acid phosphatase is an enzyme which occurs in the body in both sexes, but it occurs at higher levels in the male prostate gland and is contained in seminal emissions. Dr. Nelson removed 0.1 milliliters of fluid from the anus. His technician, Ms. Gordon, diluted this with 0.2 milliliters of saline solution, and divided the sample in half. The first test on one-half of the sample showed 14.5 sigma units of acid phosphatase. The test on the other half, involving a chemical reaction with tartrate buffer, showed that of the total, 8.1 sigma units of the acid phosphatase was prostatic acid phosphatase.

The defense experts testified that in the absence of sperm or physical injury to the anus, they would not use any level of acid phosphatase to express an opinion that there had been an act of sodomy. They also disputed the accuracy and reliability of the tartrate buffer test to identify acid phosphatase as prostatic acid phosphatase; one expert went so far as to say that the tartrate buffer test was worthless and that prostatic acid phosphatase could not be distinguished from any other acid phosphatase except electrophoretically. There was also a great deal of controversy among the experts on the conversion factor between sigma units and international units, and about dilution factors. One defense expert, using his conversion factor and dilution factor, found an amount of acid phosphatase which was below the minimum amount which the scientific literature said showed the presence of prostatic acid phosphatase. However, another of the defense experts agreed with the prosecution's dilution factors and used an even higher conversion factor, coming to a total well above the minimum which the literature said indicated the presence of prostatic acid phosphatase. He maintained, however, that high levels of the substance should not be used to support an opinion that there had been an act of sodomy in the absence of sperm or physical injury to the anus. The defense experts also testified that sperm breaks down faster than acid phosphatase, so with the levels of acid phosphatase found here, they would certainly expect to find sperm if there had been any seminal emission.

The defense pathologist, Dr. Herrmann, said that there was insufficient evidence to show either rape or sodomy, that the injuries which Dr. Nelson had described in his autopsy report were not indicative of rape, that dilation of the anus could be simply muscle relaxation after death and before rigor mortis, and that in a child of this age, he would expect much more injury if

there had been a rape or act of sodomy. He thought that the injuries to the vagina could have been caused by a tampon (though the mother testified in rebuttal that the child had not started menstruating yet) or by a finger. He also thought that Dr. Nelson had erred in considering changes in tissue after fixation in formaldehyde, as the formaldehyde distorts the appearance of the tissue.

## GUILT PHASE ISSUES

1. *Destruction of Evidence.*

At the autopsy, the pathologist took small fluid samples from the victim's vagina and anus. The vaginal sample was tested for sperm and prostatic acid phosphatase, and placed in a freezer. After three months, according to laboratory policy, it was removed from the freezer and placed on a shelf. By the time the defense expert examined it in June 1980, it was useless. The trial court granted defendant's motion to suppress the results of the initial test on this sample, as the prosecution had failed to adopt rigorous measures to preserve the evidence for a reasonable period of time.

The pathologist also gave the anal sample to a medical technologist for testing.[1] The procedure she was told to employ used up the entire sample. At the hearing on the motion to suppress this evidence, she testified that she thought it had been necessary to use up the sample to perform the test, that although she supposed she could have used only part of the material and tested it at a greater dilution, she would not have confidence in the results of such a test. The defense expert testified that in his opinion it had not been necessary to use up the whole sample in order to perform the test she used reliably. The trial court refused to suppress the evidence of prostatic acid phosphatase produced by this test on the ground that it had been necessary for the People to use up the sample.

■ Defendant argues that the trial court committed reversible error in refusing to suppress the anal sample, relying on our decision in *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], to establish that it was a due process violation for the prosecution to destroy evidence of potential exculpatory value before the defense had a chance to test it. The People argue that the standard set out in *Hitch* has been superseded by the decision of the United States Supreme Court in *California* v. *Trombetta* (1984) 467 U.S. 479, 488-489 [81 L.Ed.2d 413, 422, 104 S.Ct. 2528]: "What-

---

[1] The technician testified that she had performed the tests on the vaginal and anal samples on December 13, 1979. This must be a mistake, as the autopsy was not performed until December 14, 1979.

ever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citations], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

We recognized recently in *In re Michael L.* (1985) 39 Cal.3d 81, 86 [216 Cal.Rptr. 140, 702 P.2d 222], that the *Hitch* and the *Trombetta* formulations of the prosecution's duty to preserve evidence differ. Again, as in *Michael L.,* we find it unnecessary to determine whether *Trombetta* supersedes *Hitch,* since we think that the suppression of the fluid sample would not have been required under pre-*Trombetta* authority. When a piece of evidence in the possession of the prosecution is destroyed because the prosecution finds it necessary to consume the evidence in order to test it, there is no due process violation. The prosecution must be allowed to investigate and prosecute crime, and due process does not require that it forego investigation in order to avoid destroying potentially exculpatory evidence.

Other jurisdictions have reached a similar conclusion. The Second Circuit rejected a claim that sanctions should be imposed when the government destroyed carpet scrapings and sweepings as a necessary part of a test for the presence of heroin. "[I]t was a good faith loss that came about as a necessary consequence of the method used to analyze the scrapings and sweepings which consumed the heroin in the process. [Fn. omitted.] As such it does not invoke the sanction of exclusion of the evidence particularly where, as here, the expert who performed the scientific tests is available for cross-examination. [Citations omitted.]" (*United States* v. *Beltempo* (2d Cir. 1982) 675 F.2d 472, 479, cert. den. 457 U.S. 1135; see also *United States* v. *Love* (5th Cir. 1973) 482 F.2d 213, 218-220 [chemical analysis of acetone swabbings consumed evidence, but not considered governmental suppression].) The Colorado Supreme Court has held that the state is not prevented from performing scientific tests that destroy evidence, though such destruction cannot be condoned when it is unnecessary.[2] (*People* v. *Gomez* (1979)

---

[2] The court, faced with unnecessarily duplicative color, chromotography, ultraviolet and microcrystalline tests for the presence of heroin which destroyed the sample, affirmed an order suppressing the evidence. In addition, it set out guidelines for future cases in which prosecution tests would consume or destroy evidence. These guidelines advise courts to determine whether in drug analysis cases, prosecution experts could preserve test results on lab slides or by photograph, whether they could preserve samples used in the ultraviolet tests, and whether they could conduct a quantitative analysis. Finally, in those cases where the amount of material available for testing is small, or when the state's duty to preserve evidence would otherwise be enhanced, it may be incumbent on the state to contact the defendant to determine whether he wishes his expert to be present during the tests.

198 Colo. 105 [596 P.2d 1192, 1197]; accord, *People* v. *Garries* (Colo. 1982) 645 P.2d 1306; see also *People* v. *Dodsworth* (1978) 60 Ill.App.3d 207 [376 N.E.2d 449] [state must prove some justification for destructive testing]; *People* v. *Taylor* (1977) 54 Ill.App.3d 454 [369 N.E.2d 573] [state has heavy burden of showing destruction of evidence during testing is necessary]; *Poole* v. *State* (Miss. 1974) 291 So.2d 723, 725 [no due process violation if it was reasonably necessary for state to consume evidence in testing it]; *Lee* v. *State* (Alaska 1973) 511 P.2d 1076, 1077 [no due process violation in consumption of heroin in testing unless deliberate attempt to suppress exculpatory evidence]; see also *State* v. *Asherman* (1984) 193 Conn. 695 [478 A.2d 227, 246-247] [no due process violation in consumption of blood samples in testing in absence of showing that consumption unnecessary]; *State* v. *Kersting* (1981) 50 Ore.App. 461 [623 P.2d 1095, 1103-1104] [defendant may show due process violation in state consumption of evidence in testing by showing retest would have been possible but for state's test and by challenging state's test results by attack on manner of test].)

Defendant argues that there was insufficient evidence that it was necessary to use up the sample to run the test, and even questions whether this was the basis for the trial court's ruling. From our review of the record, we think it clear that this was the basis for the trial court's ruling. And, viewing the evidence in the light most favorable to the trial court's finding, there was substantial evidence to support the finding, and it must be upheld on appeal. (See *People* v. *Ratliff* (1986) 41 Cal.3d 675, 686 [224 Cal.Rptr. 705, 715 P.2d 665].) The technician made it clear that she did not think she could get a reliable result from a smaller fluid sample.

■ Defendant also argues that as to the vaginal sample which the trial court excluded, the trial court committed reversible error in failing to instruct the jury sua sponte that they could infer from the state's failure to preserve the vaginal fluid sample that the evidence would have favored the defendant. He relies on our decision in *People* v. *Zamora* (1980) 28 Cal.3d 88 [167 Cal.Rptr. 573, 615 P.2d 1361]. In that case the defendant sought discovery of police records which had been destroyed about two weeks before the charged crimes. As the records might have led to admissible evidence, their destruction violated the defendant's right to due process under *Hitch, supra,* 12 Cal.3d 641. We rejected defendant's argument that dismissal should be the sanction, but required the giving of a curative jury instruction.

In *Zamora, supra,* 28 Cal.3d 88, it was not possible to impose a sanction of suppression, as the evidence which had been destroyed had no value to

---

The trial court in this case wisely urged the prosecution to consider giving notice to the defense and allowing defense experts to be present when tests will make use of the evidence. This is the better practice, but it has not been established as a constitutional requirement.

the prosecution case; it was purely defense evidence. Here, by contrast, suppression of important prosecution evidence was a severe sanction on the prosecution, and eliminated the evidence as an issue from the case. The trial court found the destruction of the vaginal fluid sample nonmalicious, and there was some question how valuable the sample would have been even if properly preserved by the time the defense expert examined it. The sanction of suppression was harsh enough to have a curative impact on future police practice in determining how long to preserve evidence.

Again, it is a matter of trial court discretion to determine what sanction is appropriate when the prosecution destroys evidence. We see no abuse of discretion here.

2. *Search of Truck.*

Defendant moved to suppress evidence of stains of the victim's blood found in his truck. He contends the warrantless search of his truck violated the Fourth Amendment and requires reversal of his convictions. We disagree.[3]

The facts leading up to the search showed that defendant had changed his clothes between his first and second visits to the Kerman police station. Officer Singh saw what appeared to be blood on defendant's shoe. Defendant denied it was blood and attempted to wipe it off. Officers Lopez and Singh noticed defendant no longer had his knife, but when they looked where defendant said he had lost it, they could not find it. Sergeant McKinney at the crime scene found a bloody shoe print which matched defendant's shoe print. Sergeant McKinney told Fresno County Detective Williams about the shoe print and told Williams that defendant's truck was parked at the Kerman police station. Williams went to the Kerman police station and shone his flashlight into the interior of defendant's truck, which was parked in the parking lot. Williams observed a bloody shoe print on the floorboard which appeared to be similar to the bloody shoe print at the crime scene. The blood appeared to be fresh.

---

[3] The search of the truck unquestionably would have been constitutionally valid under present United States Supreme Court decisions, notably *Colorado* v. *Bertine* (1987) 479 U.S. 367 [93 L.Ed.2d 739, 107 S.Ct. 738], *California* v. *Carney* (1985) 471 U.S. 386 [85 L.Ed.2d 406, 105 S.Ct. 2066], and *United States* v. *Ross* (1982) 456 U.S. 798 [72 L.Ed.2d 572, 102 S.Ct. 2157]. Article I, section 28, subdivision (d) of the California Constitution, adopted in 1982, now requires California courts to apply controlling federal decisions in determining the scope of the exclusionary rule under the state Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 890 [210 Cal.Rptr. 631, 694 P.2d 744].) This rule does not apply here, however, because the events at issue took place in 1979, before the effective date of article I, section 28. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].)

Defendant was placed under arrest and Williams called the criminalist from the crime scene to determine if the blood in the truck was human blood. The criminalist entered the truck and examined the blood stains. The truck was impounded and taken to the Fresno County garage, where the criminalist took blood samples from the truck and the floor mat. The blood matched the victim's unique blood type.

At the motion to suppress, the People sought to justify the search solely on the ground of the "instrumentality" exception to the warrant requirement, i.e., that the vehicle itself is an instrumentality of the crime or is itself evidence. Defendant here argues that there is no instrumentality exception to the warrant requirement,[4] and alternatively, that the exception does not apply.

Defendant's contention is without merit. We have recognized and applied the instrumentality exception in several cases.

In *People* v. *Teale* (1969) 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564], we upheld the warrantless seizure of an automobile in which police had cause to think that the victim was shot. The officers had seized the car incident to a lawful arrest and 10 days later a criminalist examined the car and found the victim's blood spattered on the interior. We found no violation of the Fourth Amendment and, in fact, no search, since the automobile was itself evidence subject to seizure. (*Id.* at pp. 508-511.) We quoted our earlier language with approval: " '[W]hen the police lawfully seize a car which is itself *evidence* of a crime rather than merely a container of incriminating articles, they may postpone searching it until arrival at a time and place in which the examination can be performed in accordance with sound scientific procedures.' . . . [Citation.]" (*Id.* at p. 508, italics in original.)

In *North* v. *Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155], we applied the *Teale* rationale to uphold another search. There, the defendant was arrested in his apartment on kidnapping and assault charges. The police impounded his automobile, having cause to believe that it had been used in the kidnapping. They examined its interior without a warrant, and found the victim's fingerprints. We explained that the defendant's car had been seized "contemporaneous with petitioner's arrest, as evidence of the alleged kidnapping; the car was believed to be the very instrumentality used to commit the kidnapping."

---

[4]Defendant contends also that we may not consider whether the automobile exception to the warrant requirement would justify the search, because the People apparently abandoned that theory in the trial court. We need not specifically address his assertion, however, because we find that the search was proper under the instrumentality exception.

(*Id*. at p. 306, fn. omitted.) The car was simply a piece of evidence in plain view which the police were justified in seizing.

In *People* v. *Rogers* (1978) 21 Cal.3d 542 [146 Cal.Rptr. 732 [579 P.2d 1048], we held that the police were entitled to make a warrantless search of a van they had impounded from the defendant upon his arrest for committing lewd acts on children, since they had cause to think that it had been an instrumentality of the crime: "[W]hen officers, incidental to a lawful arrest, seize an automobile or other object in the reasonable belief that the object *is itself evidence* of the commission of the crime for which the arrest is made, any subsequent examination of the object for the purpose of determining its evidentiary value does not constitute a 'search' as that term is used in the California and federal Constitutions. [Citations.] In light of the evidence indicating that the pornographic snapshots were taken in the van and might depict the victims of the reported assaults, Officer Szatmary clearly had reason to believe that the van was itself evidence of the crimes for which defendant had been arrested." (*Id*. at pp. 549-550, italics in original.)

■■■ The propriety of a warrantless seizure and search where the vehicle is itself evidence or the instrumentality of a crime is implicit in a number of United States Supreme Court decisions as well. (See *Cardwell* v. *Lewis* (1974) 417 U.S. 583, 592-593 [41 L.Ed.2d 325, 336, 94 S.Ct. 2464]; *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 464 [29 L.Ed.2d 564, 581-582, 91 S.Ct. 2022] [maj. opn. of Stewart, J.], 502, 505-506 [conc. and dis. opn. of Black, J.]; *Cooper* v. *California* (1967) 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788]; *Carroll* v. *United States* (1925) 267 U.S. 132, 153, 156 [69 L.Ed. 543, 551, 552-553, 45 S.Ct. 280, 39 A.L.R. 790]; *United States* v. *Di Re* (1948) 332 U.S. 581, 586 [92 L.Ed. 210, 216, 68 S.Ct. 222]; cf. *Colorado* v. *Bertine, supra,* 479 U.S. 367, fn. 5 [93 L.Ed.2d 739, 751] and related text [dis. opn. of Marshall, J.].)

Defendant suggests that we repudiated the *Teale* line of cases in *People* v. *Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514]. We did not. We merely stated that the instrumentality exception was inapplicable on the facts before us in that case. (*People* v. *Minjares, supra,* 24 Cal.3d 410, 421.) Unlike the situation in *Minjares,* where the car trunk was merely a container of evidence, the truck in this case was itself evidence. The bloodstains that had soaked into the floorboard of the truck were clearly an appropriate subject of scientific examination and within the limits of the instrumentality exception.

### 3. *Instructional Error.*

██ Defendant argues it was error for the court to fail to instruct the jury sua sponte pursuant to CALJIC No. 2.13[5] that prior inconsistent statements are admissible not only for impeachment but as evidence of the truth of the facts stated on the prior occasion. He claims that the instruction was necessary because a crucial prosecution witness, Dr. Nelson, who had performed the autopsy, was impeached with serious inconsistencies.

Defendant has cited no authority establishing that the court has a sua sponte duty to instruct the jury pursuant to CALJIC No. 2.13, nor have we found any. Indeed, with respect to Dr. Nelson's testimony, the jury was never instructed that its use was to be restricted or limited in any way (aside from answers to which defense objections were sustained and the matters ordered stricken). So far as the jury was concerned, the testimony was admitted for all purposes and there is no reason to suppose it believed otherwise. Even if it could be concluded there was error, however, it is inconceivable that a result more favorable to defendant would have been reached had the instruction been given.

██ Defendant also argues that the trial court erred in instructing the jury pursuant to CALJIC No. 2.03.[6] This instruction tells the jury that it may infer consciousness of guilt from defendant's false or misleading statements before trial. Defendant made several statements which the jury could have determined were false or misleading, in that he fabricated a story that Kelly had left his parents' house in the company of a little girl, and he made a charade of looking for Kelly and this little girl for several hours after the offense. He also several times said he would kill anyone who had harmed Kelly; reported that he had lost his buck knife during the search for Kelly; explained that he had changed his clothes during the evening because they were too tight; and had explained that something that was probably a bloodstain on his shoe was an oil mark.

Defendant argues that after his concession that he had killed Kelly, the only issue remaining was whether he had committed the sex crimes. He

---

[5] CALJIC No. 2.13 states: "Evidence that on some former occasion, a witness made a statement or statements that were inconsistent [or consistent] with his testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on such former occasion. [¶] [If you disbelieve a witness' testimony that he no longer remembers a certain event, such testimony is inconsistent with a prior statement or statements by him describing that event.]" (CALJIC No. 2.13 (1979 rev.).)

[6] The court read CALJIC No. 2.03 as follows: "If you find that before this trial the defendant made false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

maintains that the false and misleading statements he made did not support any inference of consciousness of guilt as to the sex crimes, so that the instruction should not have been given. We disagree. First of all, his concession was not tantamount to a guilty plea, as we explain below, and the jury still had to determine whether or not he had committed a murder, and of what degree any murder was. Furthermore, defendant has provided no authority, nor have we found any, to support the proposition that a statement only supports an inference of consciousness of guilt if it mentions the particular offense, committed during a single transaction, about which the declarant feels guilty. ■ Of course, the jury must not be instructed that it may draw a particular inference unless there is evidence in the record, which, if believed, will support the suggested inference. (*People* v. *Hannon* (1977) 19 Cal.3d 588, 597 [138 Cal.Rptr. 885, 564 P.2d 1203].) ■ When the evidence indicates that a victim has been sexually attacked and killed in a single transaction at a single location, and the defendant makes misleading statements about the victim's whereabouts and condition, and tries to hide his involvement in the crimes, the jury may reasonably infer that these false and misleading statements show a consciousness of guilt of all the offenses committed during the single attack. We see no error.

Defendant also attacks the giving of CALJIC No. 2.03 on the basis of *Ulster County Court* v. *Allen* (1979) 442 U.S. 140 [60 L.Ed.2d 777, 99 S.Ct. 2213], arguing that the instruction violated due process by allowing the jury to make a wholly unsupported inference affecting the burden of proof. The high court in *Ulster County* explained that even a permissive inference may be constitutionally flawed "if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination." (*Id.* at pp. 156-157 [60 L.Ed.2d at p. 792].) Defendant admits that CALJIC No. 2.03 creates a purely permissive inference, but argues that there is no rational basis upon which the jury could think that false statements regarding defendant's involvement in the murder gave rise to any consciousness of guilt as to the sex crimes. We disagree; it *can* be inferred rationally that false statements regarding a crime show a consciousness of guilt of all the offenses committed during a single attack.

4. *Gruesome Photograph.*

■ Defendant argues that the trial court erred in failing to weigh the probative value against the prejudicial effect of a photograph showing the crime scene and the victim's body.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

 When the defendant seeks to exclude evidence under the authority of this section, "the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value. . . . [T]he reason for the rule is to furnish the appellate courts with the record necessary for meaningful review of any ensuing claim of abuse of discretion; an additional reason is to ensure that the ruling on the motion 'be the product of a mature and careful reflection on the part of the judge'. . . ." (*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].)

 While the court in this case did not explicitly say that it found the probative value of the evidence outweighed its prejudicial effect, we think it is clear from the record that the court understood the weighing function prescribed by Evidence Code section 352. At first, on the basis of defense counsel's argument that the two photographs were too prejudicial, the court sustained the objection. When the district attorney came forward with more arguments that the evidence was probative, including the argument that they were relevant to show the commission of a lewd act on a child because they showed the disarray of the clothing, the court changed its mind as to one photograph, but still excluded the closeup, which was obviously more graphic and shocking. The court explicitly stated the grounds upon which it determined that the evidence was probative, though the court did not explicitly state that it was more probative than prejudicial. Nonetheless, we think that the record adequately shows that the judge properly exercised his discretion.

Even if we found the record inadequate to review the court's exercise of discretion, defendant has still not shown that any error was prejudicial. "Our past cases make clear that a trial court's refusal to exclude otherwise admissible photographs under section 352 will not be disturbed on appeal unless the prejudicial effect clearly outweighs the photos' probative value." [Citation.] (*People* v. *Ramos* (1982) 30 Cal.3d 553, 576 [180 Cal.Rptr. 266, 639 P.2d 908].) We have viewed the photograph, and find that although it is unpleasant and explicit, it is clinical and was taken from quite some distance. We agree, too, that the photograph was relevant to premeditation, which was still in issue at the time that the photograph was admitted, and also to the disputed issue of the commission of a lewd act on a child. (Compare *People* v. *Montiel* (1985) 39 Cal.3d 910, 924-925 [218 Cal.Rptr. 572, 705 P.2d 1248] [gruesome photographs harmless, relevant to show crime scene and manner in which wounds inflicted];

*People* v. *Phillips* (1985) 41 Cal.3d 29, 54 [222 Cal.Rptr. 127, 711 P.2d 423] [gruesome photographs may have been cumulative on issue of malice, but may have been relevant to show robbery]; *People* v. *Ramos, supra,* 30 Cal.3d at p. 576 [gruesome photographs relevant to show malice and corroborate prosecution witness; no abuse of discretion].) Accordingly, there is no basis for reversal.

### 5. *Partial Concession of Guilt.*

 Defendant contends that the murder conviction must be reversed because the court permitted counsel to enter what was tantamount to a guilty plea without obtaining defendant's waiver of the constitutional rights he was giving up. Defendant contends that when defense counsel in opening statement conceded defendant's responsibility for the killing, the trial court should have intervened to advise defendant of his constitutional rights and obtain a personal waiver of those rights under *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709] and *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]. Defendant contends that since there was no such a waiver, the murder conviction must be reversed.

Counsel's decision not to contest guilt on one or more charges at the guilt phase of a capital trial is not tantamount to a guilty plea. (*People* v. *Hendricks* (1987) 43 Cal.3d 584, 592-594 [238 Cal.Rptr. 66, 737 P.2d 1350].) We rejected the same argument in *People* v. *Murphy* (1972) 8 Cal.3d 349, 365-366 [105 Cal.Rptr. 138, 503 P.2d 594], on the ground that in this situation, the defendant has not surrendered his rights since he has a jury trial with the opportunity to cross-examine, call witnesses, and testify. Further, any competent counsel will advise his client of his rights. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 314 [168 Cal.Rptr. 603, 618 P.2d 149], plur. opn., accord.) The plurality opinion in *People* v. *Frierson* (1985) 39 Cal.3d 803 [218 Cal.Rptr. 73, 705 P.2d 396] made it clear that although counsel does not have authority to override his client's express objection to conceding guilt, there is no requirement of a *Boykin/Tahl* waiver. (*Id.* at p. 818, fn. 8.) Here, unlike in *Frierson,* the record shows absolutely no indication that defendant disagreed with his attorney's tactical approach.

### 6. *Lesser Included Offense.*

 Defendant contends that as commission of a lewd act on a child in violation of Penal Code section 288 is a lesser included offense of both rape and sodomy, the lewd act conviction and special circumstance finding based on that conviction must be reversed. He also maintains that since the jury erroneously considered the lewd-act special circumstance in determining

the penalty to be imposed, that the death penalty must be reversed. The first contention must fail, and the second one need not be reached.

We recently rejected the contention that a lewd act on a child in violation of Penal Code section 288 is a lesser included offense of sodomy, in *People v. Pearson* (1986) 42 Cal.3d 351 [228 Cal.Rptr. 509, 721 P.2d 595]. We acknowledged that a defendant may not be convicted of both a greater and lesser included offense, and reiterated the standard rule: " 'The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense [citation omitted].' " (*People v. Pearson, supra,* at p. 355.) We found, however, that as sodomy is a general intent crime, while a lewd act on a child requires proof of the specific intent of "arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child . . ." (Pen. Code, § 288 subd. (a)), the latter is not necessarily included in the former. Though we were not confronted with the issue in *Pearson,* it is evident that the identical distinction exists between the crime of rape, which is a general intent crime, and the crime of committing a lewd act on a child. Accordingly, a lewd act on a child is not a necessarily included offense of either rape or sodomy.

### 7. *Instruction on Note Taking.*

■ Defendant argues, relying on our decision in *People v. Whitt* (1984) 36 Cal.3d 724, 746-749 [205 Cal.Rptr. 810, 685 P.2d 1161], that the court erred in failing to caution the jury on the pitfalls of relying on notes taken during trial. We suggested in that case that it would be the better practice to give such a cautionary instruction whenever note taking is allowed, but did not need to resolve the question as the trial court in that case gave an instruction which included the cautionary language the defendant urged was necessary. We have since made it clear that we did not intend to impose a sua sponte duty to give the cautionary instruction in *Whitt* (*People v. Silbertson* (1985) 41 Cal.3d 296, 303-304 [221 Cal.Rptr. 152, 709 P.2d 1321]) and that it is highly debatable whether our suggestion in *Whitt* that the instruction be given should apply retroactively to cases like this one, which were tried before *Whitt* was decided. (*Id.* at p. 304, fn. 11; see also *People v. Leach* (1985) 41 Cal.3d 92, 107 [221 Cal.Rptr. 826, 710 P.2d 893].) Finally, there is no indication on this record that any of the jurors did take notes, or that any omission in instruction on the subject was prejudicial.

### 8. *Intent to Kill.*

■ The jury was not instructed that the three felony-murder special circumstances required proof of intent to kill. Defendant maintains that this

was error under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. Under *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], this argument must be rejected since if defendant was guilty at all, he was guilty as the actual killer, not as an accomplice.

### 9. *Premeditation and the Felony-murder Special Circumstance.*

██ Defendant maintains that as a matter of statutory construction, the felony-murder special circumstance requires proof that the killing was wilful, deliberate, and premeditated. He relies on a single element of our statutory construction in *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, involving certain anomalies in the statute. However, we reconsidered the implication of these anomalies and rejected our former conclusions in *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1144. Therefore, defendant's reliance on *Carlos* is misplaced.

Defendant has pointed to no evidence that the voters who enacted the 1978 death penalty law intended to retain the requirement of the 1977 death penalty law that a felony murder be premeditated in order to qualify as a special circumstance. In the absence of such evidence, the fact that the 1978 initiative deleted the premeditation requirement of the 1977 death penalty law provides an overwhelming inference that the voters intended to eliminate the premeditation requirement. (Cf. *People* v. *Weidert* (1985) 39 Cal.3d 836, 844 [218 Cal.Rptr. 57, 705 P.2d 380].) Accordingly we decline to interpret paragraph 17 of Penal Code section 190.2, subdivision (a) as requiring proof of premeditation or deliberation.

### PENALTY PHASE

Defendant was 30 years old at the time of the offense and had no prior convictions. There was no evidence of any prior misconduct; in fact, the prosecution presented no evidence at the penalty phase of trial.

In mitigation, the defendant called his parents and other family members who described defendant's family background. Defendant had little schooling and had been placed in classes for slow learners. He left school at age 15 or 16 and started working as a laborer and security guard. He was considered cooperative and hardworking. Defendant was a loving stepfather to the victim for seven years. However, at the time of the offense defendant's relationship with his wife had seriously deteriorated, in part due to financial difficulties. Defendant had been laid off a day or two before the offense.

The evidence presented at the penalty phase of trial showed that there was no indication of any violence in defendant's nature, and no sign before

the offense of the coming explosion. His friends and family were shocked, believing him incapable of such an act. There was also testimony that after the offense, defendant was extremely remorseful, asking that his own life be taken.

*Commutation Instruction.*

 At the conclusion of the penalty phase, over defense counsel's objection, the court gave the so-called Briggs Instruction on the Governor's power to commute a sentence of life without possibility of parole: "You are instructed that under the state Constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole." (Former CAL-JIC No. 8.84.2 (4th ed. 1979).)[7] Since the court had overruled his objection, defense counsel tried to soften the impact of the instruction in argument by telling the jury that the Governor may also commute a death sentence, and by urging them not to let the instruction influence their penalty determination. The prosecutor was not permitted to rely on the Briggs Instruction in his argument to the jury.

In *People* v. *Ramos, supra,* 30 Cal.3d 553 (*Ramos* I), we held that the Briggs Instruction violated the federal Constitution. A majority of the United States Supreme Court disagreed. (*California* v. *Ramos* (1983) 463 U.S. 992, 1003, 1005-1006 [77 L.Ed.2d 1171, 1182, 1183-1184, 103 S.Ct. 3446].) On remand, we rejected the Briggs Instruction on state constitutional grounds. (*People* v. *Ramos, supra,* 37 Cal.3d 136, 153 (*Ramos* II).)

Respondent asks us to overrule *Ramos* II, proposing virtually the same arguments we considered and rejected in that case. We decline the invitation. (See, accord, *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1242-1243 [249 Cal.Rptr. 71, 756 P.2d 795].)

Respondent argues next that *Ramos* error should be judged by the *Watson* harmless error standard (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), as only state constitutional error is involved. We have held, however, that errors under state law at the penalty phase of a capital trial are not reviewed under the *Watson* standard. Instead, in most cases, the reviewing court must make a more exacting determination

---

[7]The Attorney General's argument that the instruction was modified is wrong. The instruction given was exactly the same as the instruction we disapproved in *Ramos, supra,* 30 Cal.3d 553.

whether there is a reasonable possibility that the error affected the verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604].)

■■■■ When the court has given the Briggs Instruction without an instruction to disregard the possibility of commutation or pardon in determining penalty, we have consistently reversed on the theory that the instruction is necessarily prejudicial. (*Ramos I, supra,* 30 Cal.3d 593; accord *People* v. *Warren* (1988) 45 Cal.3d 471, 489 [247 Cal.Rptr. 172, 754 P.2d 218]; *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1151; *People* v. *Myers* (1987) 43 Cal.3d 250, 272-273, 277 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Montiel* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248]; *Ramos II, supra,* 37 Cal.3d at p. 154; *People* v. *Haskett* (1982) 30 Cal.3d 841, 861-863 [180 Cal.Rptr. 640, 640 P.2d 776].) The instruction creates the risk that the jury will be misled and will make its penalty determination on the basis of speculation and misinformation. We do not countenance such a risk. Thus we have treated cases in which the Briggs Instruction was given without a curative instruction as belonging to the limited class of cases in which prejudice is presumed.[8]

The People also argue that defense counsel's argument to the jury cured any error by telling the jury that a death sentence may be commuted and by urging them not to consider commutation. We reject this contention, as we have before. (See *People* v. *Myers, supra,* 43 Cal.3d 250, 272-273.) The court instructed the jury that it must follow the court's instructions as to the law, which it presumably did. Further, the fact that counsel told the jury that either sentence could be commuted is of no moment, since "even if the Briggs Instruction were modified so that it was totally accurate, the instruction would still violate the state constitutional due process guarantee because its reference to the commutation power invites the jury to consider matters that are both totally speculative and that should not, in any event, influence the jury's determination." (*Ramos II, supra,* 37 Cal.3d at p. 155; see also *People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].)

The judgment is affirmed as to guilt and the special circumstance findings are upheld. The judgment is reversed as to penalty.

---

[8] This is not a case in which the trial court instructed the jury not to consider the possibility of commutation or pardon in determining the penalty. The majority of the court hold that we must presume that the jury followed such an ameliorative instruction, and so disregarded the Briggs Instruction in determining penalty. (*People* v. *Hamilton* (1988) 45 Cal.3d 351, 375-376 [247 Cal.Rptr. 31, 753 P.2d 1109]; see also *People* v. *McLain* (1988) 46 Cal.3d 97, 119-120 [249 Cal.Rptr. 630, 757 P.2d 569]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 785 [251 Cal.Rptr. 83, 759 P.2d 1260].)

Lucas, C. J., Mosk, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.