Filed 6/28/13  P. v. Ramirez CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY RAMIREZ,<br><br>        Defendant and Appellant. | A133923<br><br>(Alameda County<br>Super. Ct. No. 163788A) |

**I.**

**INTRODUCTION**

Appellant was convicted of shooting and killing a marijuana dealer during an aborted attempt to rob the victim of drugs and cash.  The principal contested issue at trial was whether appellant was the shooter.  Circumstantial and eyewitness evidence placed appellant at the scene, but the testimony of two accomplices was the only evidence that appellant was the one who fired the fatal shot.  One of the accomplices testified under a plea agreement, and the other was granted use immunity.

Appellant contends: (1) the trial court erred in permitting the prosecution to introduce statements appellant made during telephone calls from jail as evidence of consciousness of guilt; (2) the prosecution improperly vouched for the truthfulness of the accomplice witnesses; (3) the trial court erred in admitting evidence that appellant had possessed guns and robbery proceeds unrelated to the murder of the marijuana dealer; and (4) the cumulative effect of these errors deprived appellant of due process and a fair trial.  We reject these contentions, and affirm.

1

## II.

## FACTS AND PROCEDURAL BACKGROUND

### A.  The Shooting

Chad Clarke lived in a four-unit apartment building in Emeryville with his girlfriend, Christine Coleman, and Coleman's young son.  Clarke sold marijuana from the apartment, and kept two guns in a gun safe in the back bedroom he used as his office.  Clarke kept cash on his person or in a safe in his office.

At 11:00 p.m. on April 19, 2008,[1] Clarke left the apartment to conduct a marijuana sale.  While Clarke was out, two friends of his, N'Kechia Jackson (known as KK) and Jaeson Jackson (known as J), arrived at the apartment building.  They waited outside for Clarke to return home.  While waiting, the Jacksons saw two men walking around on the sidewalk.  One was a White or Hispanic man in his early twenties, about five feet seven inches or five feet eight inches tall, who was wearing a NASCAR jacket and a baseball cap and talking on a cell phone.[2]  The other was African-American; he was taller than the Hispanic man, and was wearing a hoodie.  The Jacksons saw the two men engage in a conversation with a taller White man with long hair.

Clarke returned at around 11:45 p.m. on April 19, and invited the Jacksons into his apartment.  The Jacksons left the apartment at around 12:30 a.m. on April 20.  Coleman went to bed after they left, and fell asleep.  She was awakened by the sound of Clarke screaming her name.  She went to the living room, where Clarke told her he had been shot in the leg.  Clarke was standing when Coleman entered the living room, but soon fell to the floor.  His gun was on the floor next to him.

Bryan Shipp, one of Clarke and Coleman's neighbors in the building, was in bed watching television that night when he heard a knock on Clarke's door, followed by a male voice he did not recognize, with what Shipp thought sounded like a Jamaican accent.  The male voice asked for water for an overheating car, and said that a car parked

---

[1]  All further references to dates are to the year 2008 unless otherwise noted.

[2]  At trial, the Jacksons identified appellant as the Hispanic man they had seen that night.

2

in front of the building had been hit. Shipp heard Clarke's front door open, and Clarke's voice saying, "Please don't shoot." Shipp then heard a pop, and Clarke yelling that he had been shot and calling for Coleman. Shipp called 911, and then called Clarke's telephone number. Coleman told Shipp that Clarke had been shot, and accepted Shipp's invitation to come to his apartment with her son.

Another building neighbor, Brandon Morrill, also heard a pop sound and voices at around 1:00 a.m. on April 20. He heard one person say "Wait, no, don't," and another person say, "Let's get out of here." He heard one set of footsteps running away. When questioned by the police the next morning, Morrill told the police he thought the second voice sounded like a young Black man, but unlike Shipp, Morrill did not recall hearing a Jamaican accent.[3]

Shane Gerber, who lived in an adjacent building, left his apartment around midnight on the night Clarke was shot. While getting into his car, Gerber saw two men entering the gate of Clarke's apartment building from the sidewalk. Both were in their early twenties, or possibly a bit younger. One had light skin, looked either White or Latino, and was less than six feet tall. The other was African American, and a little taller. Clarke arrived as Gerber was driving away.

### B. Accomplice Testimony

The prosecution's chief witnesses at appellant's trial were appellant's accomplices, Ricco Earl and Kolade Agbeti. Both testified against appellant under agreements with the prosecution. Earl, who was originally appellant's codefendant, entered into a plea bargain shortly before trial under which he pleaded guilty to voluntary manslaughter and conspiracy to commit robbery, and received a prison sentence of 12 to 16 years, with the understanding that unless he testified truthfully at appellant's trial, the murder charges against him, which carried a possible life sentence, would be reinstated. Agbeti, who was not charged with any crime in connection with Clarke's death, received

---

[3] Neither Shipp nor Morrill recognized appellant's voice when they heard a recording of it. Indeed, Shipp was sure that appellant's voice was *not* the one he heard that night.

a guarantee of use immunity for his testimony, with the understanding that he could be charged with perjury if he did not testify truthfully, and that he still could be criminally charged in connection with Clarke's killing.

Taken together, Earl's and Agbeti's testimony recounted the events leading up to Clarke's shooting as follows. Agbeti first met appellant while buying marijuana in 2007. Earl met appellant in early 2008 through a mutual friend named Johnny Wesley. Through appellant, Earl met Agbeti and another man named James Simons.

Earl and his girlfriend, Shannon (Shay) Schultz, had a young son who attended the same daycare as Coleman's son, and Schultz and Coleman knew one another. Through that connection, Earl knew Clarke sold marijuana, and had been in Coleman and Clarke's apartment once. Earl did not know Clarke had a gun.

Earl bought a .40-caliber Glock pistol in March 2008, and registered it. Agbeti and appellant both knew that Earl owned the gun. Agbeti and Earl also heard from appellant that appellant had weapons and had committed robberies of drug dealers. They both had seen appellant point guns at people, and Agbeti had seen appellant with money, drugs, and valuables that appellant boasted were the proceeds of his robberies. Appellant asked Earl if he knew any "easy licks," meaning drug dealers they could rob. At first, Earl told appellant he did not, but a few days before Clarke was shot, Earl suggested that he and appellant could rob Clarke using Earl's gun. Agbeti reluctantly agreed to go along, because appellant promised him marijuana and money, and Agbeti was afraid appellant would rob him or hurt his family if he refused.

On the night of April 19, Earl, Agbeti, and Simons all met at appellant's home in Rodeo. Their plan was that Simons would drive; Agbeti would be the lookout; and appellant would commit the robbery. Earl would direct them to Clarke's apartment, but he had to stay out of sight, because he was known in Clarke's neighborhood.

When the men arrived at Clarke's apartment building, Clarke was not home. The men waited for him for at least an hour. Earl stayed in the car, but the others walked

4

around. While the men were waiting for Clarke, Earl called and texted Schultz.[4] One of the texts indicated that Earl was planning to commit a robbery that night that would bring him some cash. Earl gave appellant his gun, which was loaded but did not have a bullet in the chamber. Earl also lent appellant his NASCAR jacket, because it was cold out. Appellant had on a baseball cap; Agbeti was wearing a black hoodie.

After Clarke had returned home and had been there for a while, appellant told the others that it was time to carry out their plan. Appellant and Agbeti got out of the car, and Agbeti waited by the gate while appellant went into Clarke's building. Agbeti heard a knock and some voices, and then a gunshot, which Earl also heard. Appellant emerged from the building and ran past Agbeti, exclaiming, "Oh shit." Earl asked appellant what had happened. Appellant responded that Clarke had a gun, and that appellant had fired a warning shot into the air to deter Clarke from shooting at him.

After Clarke was shot, appellant and his companions drove back to where appellant lived. During the drive, appellant threw bullets out of the car window and told the others not to say anything. That night, appellant, Earl, and Agbeti stayed at appellant's apartment. The next morning, Earl was awakened by Wesley banging on the window. Appellant was gone, and appeared to have taken Earl's gun and NASCAR jacket with him. Earl and Agbeti found out from Wesley that Clarke had been shot and killed.[5]

Earl decided to make it appear that his gun had been stolen in order to try to protect himself from being blamed for the homicide. To that end, Wesley procured bolt cutters, and he and Earl broke open Earl's mother's garage and then reported that the gun had been taken from there. The police were suspicious of Earl's stolen gun report,

---

[4] A prosecution investigator analyzed the cell phone records of the four men involved in the robbery plan. The records showed that appellant was in Rodeo until around 10:30 p.m. on April 19; arrived in Emeryville at around 11:15 p.m.; and returned to Rodeo by around 1:30 a.m. on April 20. The other three men's cell phone records were consistent with this information.

[5] Wesley later told the police that he had learned of Clarke's death from Shultz, who apparently had heard about it from Coleman.

5

because the garage contained several valuable items that had not been taken. Nonetheless, they entered the gun's serial number into their computer system.

After Earl reported his gun stolen, his mother bought him a ticket to travel to Georgia. Before Earl left the Bay Area, he received a telephone call from someone whose voice he did not recognize, warning him to keep his mouth shut. Earl was afraid that appellant would retaliate against him, and did not contact the police before he left. When Agbeti next saw appellant, appellant told him not to say anything. Agbeti spent less time with appellant after that.

In May, Earl returned to the Bay Area at the request of the police. He met with them on May 3, but lied to them to protect himself. He identified appellant's photograph, and told the police that he suspected appellant had stolen his gun, but did not implicate anyone else. Earl then returned to Georgia, where Schultz and their child joined him. When Wesley called Earl in June, in a pretext call arranged by Emeryville Police Officer Robert Alton, Earl was suspicious that the call might be being recorded, and lied to Wesley about his whereabouts at the time of Clarke's killing.

### C. The Investigation

At 1:14 a.m. on April 20, Emeryville police officers were sent to Clarke's apartment building. Shipp sent them to Clarke's apartment, where Clarke was lying motionless on the floor. Paramedics pronounced Clarke dead at the scene. An autopsy later revealed that Clarke had died from a single gunshot wound in his left abdomen, which damaged his aorta, vena cava, and liver, and then exited his body.

A handgun was found on the floor against the back wall. It was loaded, but there was no round in the chamber, and the gun was not ready to be fired. There was a bullet hole in a wall heater, and a shell casing nearby. A second gun was in a case on the couch. The officers interviewed Shipp and Morrill, who described the unknown male voice they had heard in the building.

On April 21, the Emeryville police received an anonymous voicemail message about Clarke's killing, which they later determined came from Schultz. Shultz had no direct information about Clarke's killing, and did not know any of the last names of the

6

people she mentioned. The police were unaware at the time that Schultz was connected to Earl, or that Earl was one of the people involved in the shooting. Schultz directed the police to the apartment building where appellant lived.

On April 23, the police interviewed KK and J Jackson. The Jacksons had learned about the shooting of Clarke several hours after they arrived home on the night Clarke was killed. The Jacksons described the men they had seen outside the building, and worked with a police sketch artist to develop drawings depicting the two men. The resulting sketches were introduced at trial as part of appellant's defense case. Appellant's trial counsel argued that neither of the sketches resembled appellant.

On April 29, the police learned that Earl had reported his gun stolen, and that Earl had a connection with appellant. Based on this information, they prepared photo lineups, one that included appellant and another including Earl, and showed them to the Jacksons. However, the Jacksons were not able to identify any of the persons depicted in the lineups as the men they had seen on the street outside Clarke's building.

After the shooting, the police also learned that Earl had purchased a .40-caliber pistol on April 1. Surveillance video from the gun store showed that at the time of the purchase, Earl was wearing a NASCAR jacket and was accompanied by Wesley. Wesley handled a gun during the course of the transaction, which was a violation of the terms of Wesley's parole.

On June 5, parole agents and police searched Wesley's home, and arrested him because they found a gun in his bedroom, though it was later determined not to be the gun that killed Clarke. Wesley gave an audiotaped statement to the police, which was played to the jury at appellant's trial. In the statement, Wesley said that Clarke had been killed with Earl's gun, and that on the night Clarke was killed, he saw Earl, appellant, Simons, and Agbeti getting into Simons's green Buick, and the group told him they were on their way to Emeryville.[6]

---

[6] At trial, Wesley testified that he gave the statement under duress, and that he had made up the whole story. Earl and Agbeti testified, however, that they had seen Wesley outside appellant's house as they left on their way to Clarke's.

7

On June 26, a loaded magazine for a rifle was found in the car of a woman who had been stopped for a traffic violation. The woman told the police that Jason Crain, a probationer, had borrowed the car from her. The police conducted a probation search of Crain's residence, and found a loaded .40-caliber handgun hidden in the backyard. The serial number matched that of the gun Earl had reported stolen. Ballistic testing revealed that the gun was the one used to fatally shoot Clarke. The police were aware that Crain was acquainted with appellant.

In May 2009, Earl was arrested in Georgia. The following month, he was brought back to California and charged with Clarke's murder. Eventually, Earl admitted that he was involved, and told the police that appellant was the actual shooter. At the preliminary hearings for Earl and appellant, which were held jointly, the prosecution played a tape recording of Earl's statement to the police. After the hearing, the two men got into a fight in jail, and appellant called Earl a snitch; a videotape of this incident was played for the jury at appellant's trial. After appellant learned that Earl would testify for the prosecution, graffiti appeared on the walls of the jail where Earl was in custody, labeling Earl a snitch.

In late May 2009, appellant made two telephone calls from the Contra Costa County jail. During the first call, he said he was "probably never gonna get out" of jail. In the second call, he said he was getting ready to live in jail, because he had been charged with a crime carrying a sentence of 30 years or possibly life.

On June 1, 2009—over a year after the shooting—the Jacksons were watching the news on television, and saw a story about an arrest that included a photograph of appellant. The story was not relevant to Clarke's shooting, and did not mention Clarke or a murder in Emeryville. Nonetheless, the Jacksons recognized appellant from the photograph shown on television, and reported that fact to the Emeryville police. At trial, the Jacksons identified appellant as the Hispanic man they had seen outside Clarke's building the night Clarke was shot.

In July 2011, the Emeryville police contacted Kenneth Uhlenbrock, who was a friend of appellant's. Uhlenbrock knew appellant, Earl, Agbeti, Wesley, and Simons.

8

Uhlenbrock had seen appellant with guns, but was not aware that appellant had committed robberies. Uhlenbrock was at appellant's house during the evening on April 19. When appellant left, he said he was going to the house of a marijuana dealer whom Earl knew, and that he was going to rob the dealer. Earl and Agbeti were with appellant, and Simons was driving. Later that night, the group returned without Simons, and said things had gone wrong. Appellant later told Uhlenbrock that the intended robbery victim tried to pull a gun on appellant, and appellant shot him with Earl's gun.

## D. Trial Court Proceedings

On June 1, 2010, appellant and Earl were jointly charged with murder in connection with Clarke's death. (Pen. Code, § 187, subd. (a).[7]) The information also alleged as enhancements that appellant personally and intentionally discharged a firearm, and personally caused great bodily injury or death. (§§ 1192.7, subd. (c); former §§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d), (g).[8])

On July 5, 2011, the case was assigned for trial. On July 7, 2011, Earl entered into the plea agreement described above, under which he agreed to testify against appellant. The jury in appellant's trial was sworn on July 20, 2011, and deliberations began on August 15.

On August 22, 2011, the jury returned a verdict finding appellant guilty of first degree murder, and declared itself deadlocked on the enhancements. On October 14, 2011, appellant was sentenced to a term of 25 years to life, and the enhancement allegations were dismissed on the prosecution's motion. This timely appeal ensued.

---

[7] All further references to statutes are to the Penal Code unless otherwise noted.

[8] Former sections 12022.5 and 12022.53 were repealed in 2010, operative January 1, 2012. (Stats. 2010, ch. 711, § 4; see generally Nonsubstantive Reorganization of Deadly Weapon Statutes (June 2009) 38 Cal. L. Revision Com. Rep. 217.)

9

## III.

## DISCUSSION

**A. Admission of Appellant's Statements During Jailhouse Telephone Calls**

As already noted, during telephone calls from jail after his arrest for Clarke's killing, appellant made two statements indicating that he did not expect he would ever be released from custody. Evidence of these statements was introduced at trial over appellant's objection. The trial court ruled that the statements were admissible because they could be interpreted as evidence of appellant's consciousness of guilt.

During closing argument, appellant's trial counsel contended that appellant's statements showed only that he was in shock and concerned about his situation. Counsel argued than an innocent person would be even more upset about being arrested and accused that a guilty one. In rebuttal, the prosecutor argued, based in part on appellant's tone of voice, that the "calls show[ed] that even [appellant] knows he's guilty of murder."

Appellant contends that the trial court erred in admitting the evidence of appellant's statements, and in failing to instruct the jury regarding how to determine whether the statements showed consciousness of guilt, and if so, how to consider this evidence.

### 1. Relevance to Show Consciousness of Guilt

Evidence of statements or other behavior by a criminal defendant that tends to show consciousness of guilt (COG evidence) is admissible against the defendant at trial. (*People v. Kimble* (1988) 44 Cal.3d 480, 497 [" 'Deception, falsehood, and fabrications as to the facts of the case are treated as tending to show consciousness of guilt, and are admissible on the same theory as flight and concealment of the person when charged with crime' "].) Appellant does not dispute this basic principle, but argues that the statements admitted in this case were not relevant to show consciousness of guilt.

In most of the reported cases, the type of COG evidence at issue consisted either of behavior by the defendant, such as fleeing the jurisdiction or suppressing adverse evidence, or of exculpatory statements by the defendant that were false. Thus, the CALCRIM and CALJIC instructions on consciousness of guilt are tailored to this type of

10

COG evidence. (See CALCRIM Nos. 362 [false statements about charged crime]; 371 [suppression or fabrication of evidence]; 372 [flight]; CALJIC Nos. 2.03 [falsehood], 2.04 [fabrication of evidence], 2.06 [suppression of evidence], 2.52 [flight].)

In the present case, in contrast, the evidence consisted of appellant's statements about the likelihood of his lengthy incarceration. Appellant argues that such statements are not relevant to the issue of consciousness of guilt, and are therefore not proper COG evidence. Appellant does not cite any authority for this proposition, however, and our research has not revealed any authority specifically addressing the question. There is, however, authority indicating that whether a given type of evidence is admissible to show consciousness of guilt is a question of law, and that the test is whether a jury could reasonably and rationally infer consciousness of guilt from that evidence. (See *People v. Griffin* (1988) 46 Cal.3d 1011, 1026-1027; see also *People v. Hannon* (1977) 19 Cal.3d 588, 597-598, disapproved on another ground by *People v. Martinez* (2000) 22 Cal.4th 750, 762-763.)

We acknowledge that appellant's statements were not unequivocal, as appellant's trial counsel pointed out to the jury in his closing argument. Nonetheless, because the statements were made while appellant was awaiting trial for the homicide of Clarke, they were certainly susceptible of the interpretation urged by the prosecution, i.e., that appellant expected to be sentenced to a lengthy prison term because he knew he was guilty of killing Clarke. In short, a reasonable jury could choose to infer consciousness of guilt from appellant's concern that he would not be released from custody for many years, if ever. For that reason, the trial court did not err in determining that the statements constituted relevant and admissible COG evidence.

### 2. Adequacy of Jury Instructions

The trial court instructed the jury with CALCRIM No. 358, regarding evidence of pretrial statements attributed to the defendant. The instruction tells the jury to decide whether the defendant actually made the statements, and if so, to consider them, along with all the other evidence, in reaching its verdict. The instruction informs the jury that it

11

must decide how much importance to give the statements, and advises it to consider with caution any statement tending to show guilt if the statement was not written or recorded.

Appellant argues that the trial court should have instructed the jury more specifically that it could not consider the statements as COG evidence unless it found that the statements were actually made. Appellant also argues that the instructions did not adequately inform the jury regarding how it should interpret the evidence, any limitations on its use, and the fact that COG evidence alone cannot establish guilt. These contentions were forfeited by appellant's failure to request that such instructions be given in addition to CALCRIM No. 358. (*People v. Riggs* (2008) 44 Cal.4th 248, 309; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].)

Even if the issue had been preserved, however, appellant would still have the burden of demonstrating that the absence of further instructions prejudiced him. (See *People v. Riggs*, *supra*, 44 Cal.4th at p. 311.) On the issue of whether appellant actually made the statements, properly authenticated tape recordings of appellant's jailhouse telephone calls were admitted into evidence, and there was no evidence that the recordings were falsified or inaccurate. Thus, no reasonable jury, even if properly instructed, could have failed to find that appellant in fact made the statements attributed to him.

As for the prohibition against finding a defendant guilty based on COG evidence alone, in the present case there was ample independent evidence, far stronger and more direct than appellant's statements, supporting the jury's finding that appellant was the person who shot and killed Clarke. Based on the record in its entirety, there is no reasonable likelihood that appellant would have achieved a better outcome if the jury had been instructed more explicitly not to convict appellant based on his statements alone. In short, any error in failing to instruct the jury more explicitly regarding the use of appellant's statements was harmless beyond a reasonable doubt.

12

## B. Argument and Evidence Regarding Accomplices' Credibility

As noted earlier, both Earl and Agbeti testified under the terms of agreements with the prosecution that obligated them to testify truthfully at appellant's trial. Appellant contends that his conviction should be reversed based on the prosecutor's improper and prejudicial arguments about the accomplice testimony, and because the full contents of the accomplices' agreements were erroneously disclosed to the jury.

### 1. Improper Vouching by Prosecutor

During the prosecution's initial closing argument, the prosecutor referred to the provision in Earl's plea agreement that the murder charges against Earl would be reinstated if Earl did not testify truthfully, whereas under the plea agreement, Earl faced a maximum sentence of 12 to 16 years in prison. Based on this provision, the prosecutor argued that "Earl had every incentive to give complete, honest, and truthful testimony when he testified in this case." Defense counsel's closing argument urged the jury to conclude that Earl was lying when he stated that appellant was the person who shot Clarke. In rebuttal, the prosecutor described Earl as having "everything to gain from telling the truth and everything to lose by lying in court." The prosecutor also argued that Earl had "the greatest incentive ever to tell the truth because, if he does not, he will lose the [plea] agreement and will be back up on murder charges. And if the truth was that [appellant] was not the killer, [if] he got up here and said so, was telling the truth, he'd still get the agreement. Since the truth is [appellant] is the killer, that is why [Earl] testified [appellant] was the killer."

Appellant contends that the quoted portions of the prosecutor's argument amounted to improperly vouching for Earl's truthfulness, and that his conviction must be

13

reversed due to this prosecutorial misconduct.**9** Our review of this issue is guided by our Supreme Court's opinion in *People v. Bonilla* (2007) 41 Cal.4th 313 (*Bonilla*). In *Bonilla,* the court summarized the applicable legal principles as follows: "It is misconduct for prosecutors to bolster their case 'by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.' [Citation.] Similarly, it is misconduct 'to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness.' [Citation.] The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' [Citation.] However, these limits do not preclude all comment regarding a witness's credibility. ' " '[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' [Citation.] '[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [the prosecutor's] comments cannot be characterized as improper vouching.' [Citation.]" (*Id*. at pp. 336-337.)

The *Bonilla* court specifically found to be proper the following types of prosecutorial comment on accomplice testimony given under the terms of a plea agreement: "arguments that [the accomplice] should be believed because he had an

---

**9** Appellant mentions Agbeti in the section of his opening brief dealing with prosecutorial vouching, but does not specify what portion of the prosecution's argument he contends constituted vouching. Accordingly, we deem the vouching argument abandoned as to Agbeti. (Appellant's contentions regarding the admission into evidence of Agbeti's use immunity agreement are discussed *post*.) As to Earl, we reach the merits of appellant's vouching contention despite his trial counsel's failure to object to the arguments at issue, because respondent does not contend that the issue was forfeited, and we have discretion to reach the merits in order to forestall a potential future ineffective assistance of counsel claim. (Cf. *People v. Butler* (2003) 31 Cal.4th 1119, 1128; *People v. Blanco* (1992) 10 Cal.App.4th 1167, 1171-1173.)

incentive to tell the truth under the terms of his plea agreement; . . . and arguments he should be believed because other evidence in the record corroborated his testimony. These [are] arguments from the evidence, suggesting reasonable inferences the jury could draw that might lead it to credit [the accomplice's] testimony. They did not suggest the prosecutor had personal knowledge of facts outside the record showing [the accomplice] was telling the truth." (*Bonilla*, *supra*, 41 Cal.4th at p. 337.)

The prosecutor's arguments in the present case were indistinguishable from those discussed and approved in *Bonilla*, *supra*, 41 Cal.4th at pages 336-337, with one arguable exception. The exception is the prosecutor's statement that "the truth is [appellant] is the killer, that is why [Earl] testified [appellant] was the killer." In context, however, the thrust of this argument was that Earl's incentive under the plea agreement was to testify *truthfully*, and therefore *not* to testify that appellant was the killer *unless* that was true. In light of the record as a whole, there is no reasonable likelihood that the jury could have drawn an inference from this argument that the prosecution had additional evidence against appellant, not disclosed to the jury, that corroborated Earl's testimony. Accordingly, we are not persuaded that this part of the prosecutor's argument constituted misconduct or was improper.

### 2. Introduction of Agreements into Evidence

As appellant acknowledges, when an accomplice testifies for the prosecution under an agreement, the agreement must be disclosed to the jury in order to provide it with all facts relevant to the accomplice's credibility. (*People v. Phillips* (1985) 41 Cal.3d 29, 47.) Appellant argues, however, that in the present case, the jury should not have been told *how* it would be determined whether Earl and Agbeti had testified truthfully, as required by their respective agreements.

In support of this proposition, appellant relies on language from *People v. Fauber* (1992) 2 Cal.4th 792 (*Fauber*). In *Fauber*, as here, an accomplice of the defendant testified for the prosecution under the terms of a plea agreement. The agreement provided that if the accomplice testified truthfully against the defendant, the accomplice would be charged with, and plead guilty to, second-degree rather than first-degree

15

murder. It went on to provide that before the agreement could become effective, the accomplice's credibility would be assessed by the district attorney's office, and that if a dispute arose regarding the accomplice's truthfulness, it would be resolved by the trial judge. (*Id.* at p. 820, fn. 4.) The entire agreement was read to the jury without objection, but on appeal, the defendant contended that the portions of the agreement permitting the prosecution and the trial judge to assess the accomplice's credibility invaded the province of the jury and amounted to improper vouching. (*Id.* at pp. 820-822.)

In *Fauber*, the Supreme Court opined that "the plea agreement's reference to the district attorney's preliminary determination of [the accomplice's] credibility had little or no relevancy to [the accomplice's] veracity at trial, other than to suggest that the prosecutor found him credible. Thus, the reference should have been excised on a timely objection on the ground of irrelevancy." (*Fauber*, *supra*, 2 Cal.4th at p. 822.) The court also held that the portion of the agreement "detailing the [trial] judge's determination of [the accomplice's] credibility in the event of any dispute arguably carried some slight potential for jury confusion, in that it did not *explicitly* state . . . that the need for such a determination would arise, if at all, in connection with [the accomplice's] sentencing, not in the process of trying [the] defendant's guilt or innocence." (*Id.* at p. 823.) Thus, the court concluded, that part of the agreement also should not have been placed before the jury. Ultimately, however, the court held that any errors in connection with the disclosure of the plea agreement to the jury were harmless.

In *Bonilla*, *supra*, 41 Cal.4th 313, the prosecutor also read the accomplice's entire plea agreement to the jury. The Supreme Court held that this was proper, and distinguished *Fauber*, *supra*, 2 Cal.4th 792, on the basis that the accomplice's plea agreement in *Bonilla* did not contain any provision indicating that the *prosecution* "had made or would make any preliminary determination that [the accomplice] was being truthful." (*Bonilla*, *supra*, 41 Cal.4th at p. 338, fn. 9.) The court went on to reject the contention that admission of the agreement was error because the provision making the agreement contingent on the accomplice's truthfulness at trial would lead the jury to conclude that the prosecutor believed the accomplice was truthful. As the court reasoned,

16

"[t]he jury *might* believe the prosecutor thought [the accomplice] was being truthful, but there is no reason to think it would have concluded the prosecutor had special information *outside the record* on which to base that belief, nor is there any reason to think this inference would have led the jury to conclude it no longer needed to evaluate [the accomplice's] credibility for itself." (*Ibid.*)

In the present case, no express reference was made, either in the agreements themselves or in the arguments of counsel, to any determination of the accomplices' credibility by the *prosecution*. The jury was correctly instructed that they were the sole judges of the witnesses' credibility. The jury was told that Earl's credibility for sentencing purposes in Earl's own case would be determined by the trial judge. However, the judge expressly reminded the jury, in response to an objection by defense counsel during closing argument, that "for the purposes of the evidence in this trial on the charges presented," Earl's credibility was an issue for the jury, not the trial judge. After giving this admonition, the judge noted for the record that the jury were "all nodding in agreement about that distinction."

For all of these reasons, we conclude that as to Earl's plea agreement, the facts of this case are closer to those in *Bonilla*, *supra*, 41 Cal.4th 313, than to *Fauber*, *supra*, 2 Cal.4th 792. Moreover, even in *Fauber*, the Supreme Court ultimately found that the admission of the irrelevant portions of the accomplice's plea agreement was harmless error, for three reasons: first, because "[t]he prosecutor argued for [the accomplice's] credibility based on the evidence adduced at trial, not on the strength of extrajudicial information obliquely referred to in the plea agreement"; second, because "common sense suggests that the jury will usually assume—without being told—that the prosecutor has at some point interviewed the principal witness and found his testimony believable, else he would not be testifying"; and third, because "the requirement that [the accomplice] preliminarily satisfy the prosecutor as to his credibility 'cuts both ways': it suggests not only an incentive to tell the truth but also a motive to testify as the prosecutor wishes. [Citation.]" (*Fauber*, *supra*, 2 Cal.4th at p. 822.) For the same

reasons, even if there were error in the present case, we would find it harmless beyond a reasonable doubt.

As to Agbeti, the jury was told that he could be prosecuted for perjury if his testimony were not truthful, and that he could also be prosecuted for the underlying crimes based on any evidence other than his testimony at appellant's trial. Based on this evidence, appellant contends that the evidence regarding Agbeti's immunity agreement suffered from the same flaw as the plea agreement in *Fauber*, *supra*, 2 Cal.4th 792, in that, as appellant argues colorfully, "[i]t was only the prosecutor who held the sword over Agbeti's head." Nonetheless, unlike the situation in *Fauber*, the jury in the present case was not told that the prosecutor had already determined, in advance of the trial, that Agbeti would be a credible witness. In our view, that was the chief problem identified by the Supreme Court in *Fauber*. As it was not present here, we are not persuaded that the introduction of evidence regarding that agreement could have improperly affected the jury's assessment of Agbeti's credibility. Indeed, because appellant does not point to any other unusual and prejudicial circumstance with regard to Agbeti's use immunity agreement, to reverse on that ground would effectively preclude prosecutors from introducing the testimony of *any* unprosecuted accomplice under a use immunity agreement. Accordingly, we discern no error in the trial court's admission of evidence regarding Agbeti's use immunity agreement.

## C. Evidence of Appellant's Possession of Guns and Robbery Proceeds

The trial judge permitted the prosecutor to elicit testimony from Earl, Agbeti, and Uhlenbrock in which the witnesses related appellant's statements to them, prior to Clarke's shooting, regarding appellant's experience and self-proclaimed expertise in robbing drug dealers. As the jury instructions made clear, this testimony was admitted not to prove appellant's bad character or propensity to commit crimes, but rather to show that appellant "acted with the intent to commit robbery in this case." (See Evid. Code, §§ 1101, subd. (b) [evidence of past crime admissible to show intent, preparation, or plan], 1250, subd. (a) [evidence of person's out-of-court statement about person's own intent or plan not hearsay when offered to prove or explain person's conduct].) Appellant

18

does not appear to challenge the admission of the evidence of appellant's past statements for this limited purpose, and in any event, it was not error. (See *People v. Sanders* (1995) 11 Cal.4th 475, 517-518; *People v. Karis* (1988) 46 Cal.3d 612, 634-637.)

In the course of giving this testimony, however, the three witnesses also testified about appellant's past *actions*. All three of them said they had seen appellant with guns, and that they had seen him point them at people. Agbeti also testified that he had seen appellant with the proceeds of prior robberies, including jewelry, money, and guns. Appellant contends that this evidence constituted prejudicial propensity evidence that was inadmissible under Evidence Code section 1101, subdivision (a), which provides that "evidence of a person's character or a trait of his or her character ([including] evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." We review the trial court's decision on this issue for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668; *People v. Davis* (2009) 46 Cal.4th 539, 602.)

Respondent counters that this conduct evidence, like the evidence of appellant's statements, was admissible under Evidence Code section 1101, subdivision (b) to show appellant's intent in connection with the shooting of Clarke and the events leading up to it. We agree. Evidence that appellant had been in possession of robbery proceeds, like his statements about his past robberies, was relevant to show his intent to rob Clarke. Evidence that appellant had pointed guns at people in the past was relevant to cast doubt on his claim to his confederates, immediately upon leaving Clarke's neighborhood, that he had fired into the air, not at Clarke.[10] (See *People v. Smith* (2003) 30 Cal.4th 581, 612-614 [evidence that defendant possessed both loaded and unloaded guns, and chose loaded one to bring with him when committing crime, was admissible to refute

---

[10] Moreover, given the jury's failure to reach a verdict on the enhancement allegations charging personal use of a firearm and personal infliction of great bodily injury or death, it appears the jury did not determine that appellant was necessarily the shooter, but only that he was a participant in the robbery plan that led to Clarke's death. Thus, even if it was error to admit evidence regarding appellant's past behavior of pointing guns at people, the error was harmless beyond a reasonable doubt.

19

defendant's claim that he only intended to use gun to intimidate victim and did not mean to shoot her].)  Accordingly, we see no error in the admission of this evidence.[11]

## IV.

## DISPOSITION

The judgment is affirmed.


_____
RUVOLO, P. J.


We concur:


_____
RIVERA, J.


_____
HUMES, J.

---

[11] Appellant also contends that his conviction should be reversed based on the cumulative effect of the errors he asserts.  As we have found no error, we reject this argument as well.