Filed 2/6/15  P. v. Dragasits CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064288 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD233681) |
| STEPHEN JOSEPH DRAGASITS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Frederick Maguire, and Charles R. Gill, Judges.  Affirmed as modified.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, Lise Jacobson and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

As a result of a buccal swab taken in February 2011 after Stephen Joseph Dragasits's arrest on another charge, police found incriminating evidence connecting

Dragasits to crimes occurring in April 2011. Dragasits unsuccessfully moved to suppress the evidence, and thereafter, a jury convicted him of two counts of shooting at an occupied vehicle (Pen. Code,[1] § 246; counts 3 and 4), two counts of assault with a deadly weapon (§ 245, subd. (a)(2); counts 5 and 6), and found true great bodily injury and firearm use enhancement allegations.[2]

Dragasits contends the trial court should have suppressed the DNA evidence linking him to his crimes because hours before his DNA was taken in February 2011, the crime for which he was arrested had been reduced to a misdemeanor, and therefore the sample was obtained in violation of section 296.1 of the DNA and Forensic Identification Data Base and Data Bank Act of 1998 (the DNA Act). Dragasits argues that to the extent this court construes section 296 of the DNA Act to authorize collection of a DNA sample from every person initially arrested for a felony, it is unconstitutional and violates the Fourth Amendment. Dragasits further contends he was denied due process when police consumed the entire DNA sample found on the shell casings found at the crime scene. He contends that even if we conclude no due process violation occurred in the

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

[2] On the count 3 offense of shooting at an occupied vehicle, the jury found true allegations that Dragasits personally inflicted great bodily injury (§ 12022.7, subd. (a)) and discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). With respect to the count 5 assault, the jury found true allegations that Dragasits inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a firearm (§ 12022.5 subd. (a)). As to counts 3, 4, 5 and 6, the jury found true allegations that Dragasits used a firearm within the meaning of section 1192.7, subdivision (c)(8). The court sentenced Dragasits to an indeterminate term of 25 years to life plus a determinate term of 11 years 4 months in state prison.

consumption of his DNA sample, the trial court nevertheless prejudicially erred by refusing his pinpoint jury instruction addressing his inability to produce his own DNA evidence. Finally, Dragasits contends, and the People concede, that the abstract of judgment must be corrected to reflect the custody credits awarded by the court during the sentencing hearing. We affirm the judgment as modified to correct the custody credits.

FACTUAL AND PROCEDURAL HISTORY[3]

*Initial Arrest and Booking*

On February 26, 2011, Marcus Wilson was driving southbound on State Route 163 when a large object hit his car and knocked off one of his mirrors. He saw the object come from a motorhome parked on a road next to the freeway. Wilson took the next exit and pulled up behind the motorhome. He saw Dragasits throwing big pieces of rocks onto the freeway and called police. One of the rocks was the size of a football.

San Diego Police Officer Eric Obendorfer, who was called to the scene, determined based on the size of the rocks that they were inherently likely to cause great bodily injury or death. Officer Obendorfer arrested Dragasits on a felony charge of throwing a substance at a vehicle that is capable of causing serious bodily harm with intent to cause great bodily injury (Veh. Code, § 23110, subd. (b)) and took him to the county jail. There, the officer prepared a booking slip and a declaration of charges indicating Dragasits was arrested for a felony violation of Vehicle Code section 23110, subdivision (b).

---

[3] Some of the background facts are taken from testimony elicited at Dragasits's preliminary hearing.

On February 27, 2011, a magistrate judge reviewed Officer Obendorfer's declaration concerning Dragasits's arrest and determined that there was probable cause to believe Dragasits had committed a crime. The officer's declaration in part stated that Dragasits was standing next to his motorhome "throwing numerous rocks approximately 2" by 3" in diameter at moving vehicle [*sic*] on the freeway" and that he struck a vehicle in the Clairemont Mesa Boulevard exit lane causing damage to it. The victim whose vehicle was struck exited the freeway and witnessed Dragasits throw three more rocks onto the freeway.

On February 28, 2011, at approximately 6:00 a.m., San Diego County Deputy Sheriff Lourdes Kirkpatrick, one of the deputies responsible for swabbing inmates for DNA at the San Diego Central Jail, was given a list of inmates flagged for DNA samples, including Dragasits. At about the same time that morning, San Diego Police Department Detective Michael Brogdon was assigned as a follow-up investigator to Dragasits's arrest. After reviewing the case, Detective Brogdon reduced Dragasits's charge from a felony to a misdemeanor charge under Vehicle Code section 23110, subdivision (a), by filling out a change of charge form. By 7:00 a.m., Detective Brogdon had made a copy of the change of charge form, which was later faxed to the district attorney's office, the city attorney's office, and the San Diego County Jail, with the original going to the San Diego Police Department records division.

At 2:38 p.m., Deputy Kirkpatrick took Dragasits's DNA sample via buccal swab.

*The Shootings*

On April 5, 2011, near the same area that Dragasits threw objects onto the freeway, an individual fired at least eleven rounds of a .22-caliber rifle at passing cars. Two of the bullets hit cars, one of which pierced the side of a victim. A third bullet struck a building across the freeway. A dash camera picture captured, and some witnesses saw, Dragasits's motorhome parked in the area where the gun shots were heard. Officers recovered eleven shell casings along the side of the freeway and submitted them for analysis.

Two days later, a California Highway Patrol investigator received a "break" in the case: a city attorney advised him she had a rock-throwing case involving Dragasits who was known to live in a motorhome in the area. The investigator obtained photographs and reports of the rock-throwing incident, and he obtained Dragasits's motorhome's license plate, make and model. Investigators returned to the area to look for additional evidence and as they were leaving, observed Dragasits's motorhome parked along the roadway. The next day, the investigators decided to conduct surveillance and placed a GPS tracker on Dragasits's motorhome. The following day, April 9, 2011, investigators located and collected another shell casing in the area.

About a week later, officers were advised that DNA found on the shell casings matched Dragasits's DNA. The officers then conducted a search of Dragasits's motorhome and found a rifle scope, a receipt for ammunition, additional .22-caliber shell casings, and a scale to reload gun powder and make new ammunition. A criminalist determined that all but one of the casings (item 28) found inside the motorhome were

5

fired by the same gun—a semi-automatic rifle—from which the casings found alongside the freeway had been fired. Item 28 had been chambered in and extracted from the same gun.

*Preliminary Hearing—Dragasits's First Suppression Motion*

Before his preliminary hearing, Dragasits moved under section 1538.5, the Fourth Amendment, and the California Constitution to suppress incriminating evidence from the search of his motorhome including the rifle scope, shell casings and receipt, as well as the DNA taken from him in February 2011. In part, he argued it was unreasonable under the Fourth Amendment to seize the DNA profile of an arrestee without a warrant or exigent circumstances.

At the suppression motion, Officer Obendorfer described the booking process Dragasits underwent when he was arrested and taken to county jail. He testified that he arrested Dragasits for a felony and Dragasits was booked under the felony section of section 23110. Officer Obendorfer testified he did not learn that Dragasits's charge had been reduced to a misdemeanor until just before the preliminary hearing.

San Diego Deputy Sheriff Angel Sevilla, assigned to inmate classification at the San Diego Central Jail, described the procedures for taking a suspect's DNA. He explained that when an inmate came into their custody they would run a criminal background check, check the inmate's rap sheet for prior felony convictions, and look at the booking summary to see the inmate's current arrests to determine whether DNA should be taken. He testified that if anything came in as a felony arrest and DNA had not been taken, the arrestee would "automatically be flagged for DNA." According to

6

Deputy Sevilla, once the classification deputy determined an inmate's DNA should be taken, the deputy would flag it in the system and the flag would trip another report that is generated and sent to the floor deputy, who would print out the report. The report would explain why DNA was to be taken and the inmate's charges. The timing of DNA collection would vary with each inmate, but it would sometimes be taken immediately if a deputy was available.

Deputy Sevilla testified that the booking staff was responsible for updating the booking summary, which contained the inmate's name and social security number, booking number, arrest date, charges, case number, and disposition date, and would also make clarifications if charges were changed, added or subtracted. He stated that notifications occurred four times a day as to changes in charges, convictions or dispositions, and the booking summary would keep the most current charges. Deputy Sevilla testified that if an inmate's charge was reduced or changed to a misdemeanor, the inmate would no longer qualify for DNA collection unless he had other qualifying factors.

Deputy Kirkpatrick testified that a person assigned to taking DNA samples would be handed a list from their supervisor, then start calling the different modules and either meet with the inmate or have the inmate brought to the second floor where DNA collection would be performed. As for her team, her sergeant printed out their list at the beginning of their shift and handed it to the assigned deputy at their 6:00 a.m. briefing. The deputy would run his or her own list and start working on it. Deputy Kirkpatrick acted according to her list printed out from the morning; though she acknowledged it was

7

not unusual for inmates to have their charges changed while in custody, it was not their procedure to conduct a secondary check to ensure the individuals on the DNA collection list still had qualifying offenses. She testified that it was very rare that an individual's DNA was mistakenly taken. Once the individual's DNA was taken, the deputy notified the classification division that the DNA collection was completed and the individual was removed from the list.

After considering counsels' arguments, Superior Court Judge Melinda Lasater found that the arresting officer acted reasonably and within the scope of his duties under the circumstances in deciding that Dragasits's conduct in the rock throwing incident qualified as a felony. The court ruled that the investigating officer's decision to reduce the felony to a misdemeanor did not negate the fact that Dragasits was arrested for a felony, and that even though the jail had been notified of the change, the officer who took Dragasits's DNA sample later that day did not know about the reduction in charge, but took the sample based on her paperwork and with "an honest and good faith belief . . . that [Dragasits] was on the list." The court ruled the DNA collection was a valid act, a minimal invasion of privacy under the totality of the circumstances, and did not justify suppressing the evidence. The court made it clear that the result would have been different had the collection officer known of the reduction in charge, since a suppression motion is intended to penalize law enforcement officers who act outside the scope of their duties and do not follow the constitution.

8

*Dragasits's Renewed Suppression Motion*

Dragasits renewed his suppression motion before trial under section 1538.5, subdivision (i). In addition to arguing that the collection of his DNA as a mere arrestee was unreasonable and violated the Fourth Amendment, he argued Deputy Kirkpatrick did not act in good faith when she took his buccal swab because she did not check the records for updates despite knowing they were updated several times a day to reflect an inmate's charges, and the sheriff's department had no procedure to check internal records for the continued existence of qualifying offenses. He also argued he was not lawfully arrested with a felony in February 2011, because Officer Obendorfer was mistaken about the felony offense's elements. He further argued his DNA was illegally submitted to the Combined DNA Index System (CODIS). In opposition, the prosecutor argued that because Dragasits was arrested for a felony, Deputy Kirkpatrick's good faith did not matter, but that Judge Lasater nevertheless correctly found she acted in good faith. She argued that the same reasons justified the DNA's submission to CODIS, regardless of the later reduction in Dragasits's charge to a misdemeanor.

Superior Court Judge Frederick Maguire denied the motion. He found ample evidence supported Judge Lasater's conclusion that Dragasits was lawfully arrested for a felony; that there was probable cause for a felony Vehicle Code section 23110 charge. He agreed with Judge Lasater that if a person is arrested on a felony, his or her DNA may be collected even though the case gets reduced at a later point in time, and the DNA can be submitted to the CODIS database. In a lengthy analysis of case law, Judge Maguire explained that as to the good faith of law enforcement, the focus was on objective

9

culpability: whether a reasonably well-trained officer would have known the search was illegal. Judge Maguire stated he would have to find there was systematic negligence, or reckless, deliberate or egregious conduct in taking Dragasits's DNA to justify application of the exclusionary rule, and that the circumstances showed "nothing more than simple negligence;" there was no evidence of systematic negligence on the part of the officers in this case.[4]

## DISCUSSION

I. *The Court Did Not Err by Denying Dragasits's Motion to Suppress Under the Good Faith Exception to the Exclusionary Rule*

Dragasits contends the trial court improperly denied his motion to suppress the DNA evidence linking him to the shell casings as well as the evidence found in his motorhome. He advances a series of challenges to collection of his DNA, contending it violated the terms of the DNA Act under a proper interpretation of the term "arrested" in the statute as well as the Fourth Amendment, because at the time his buccal swab was

---

[4]     In part, Judge Maguire said: "My sense is that [Deputy] Kirkpatrick acted in good faith. I don't see a systematic deficiency causing a systematic negligence. But I do see it as—I don't know if I see it as negligent. They are doing as much as they can. They are dealing with lots of people. And, you know, at some point in time, the information has to make its way through the system. [¶] I think it is probably legally at least negligence, based on the way the court has interpreted the previous cases. But I don't see it as systematic negligence. [¶] Secondly, once he is arrested for the felony, they can take [his DNA]. And, if they take it, it can go in the CODIS database. That's kind of the way I see it. [¶] I don't think [Judge Lasater] had it wrong. I would have to find that she was wrong in her application of the law, or her understanding of the law. . . . [¶] . . . You can't willfully take a blind eye to something. And they thought he was arrested for a felony. He was arrested for a felony. So they could take it. But they thought he was still in custody for a felony, when, at the time, the information was several hours old. [¶] But I think it qualifies as good faith, and it is nothing more than simple negligence."

10

taken, he was under arrest for a misdemeanor offense and did not qualify for DNA collection. As we shall explain, we do not reach these issues, because assuming without deciding that the collection of Dragasits's DNA violated both the DNA Act and the Fourth Amendment, we conclude there is no basis for exclusion under the good faith exception to the exclusionary rule as applied in *Herring v. United States* (2009) 555 U.S. 135, 139 (*Herring*) and *People v. Robinson* (2010) 47 Cal.4th 1104, 1119 (*Robinson*).

A. *Standard of Review*

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Maury* (2003) 30 Cal.4th 342, 384; see also *People v. Letner* (2010) 50 Cal.4th 99, 145.) This court "consider[s] the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision." (*Letner*, at p. 145.)

B. *The Fourth Amendment and the Good Faith Exception to the Exclusionary Rule*

" 'Pursuant to article I, section 28, of the California Constitution, a trial court may exclude evidence under Penal Code section 1538.5 only if exclusion is mandated by the federal Constitution.' [Citation.] Our Constitution thus prohibits employing an exclusionary rule that is more expansive than that articulated by the United States Supreme Court." (*Robinson*, *supra*, 47 Cal.4th at p. 1119.)

11

The Fourth Amendment of the U.S. Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.) The guarantee of the Fourth Amendment has been incorporated into the Fourteenth Amendment to the federal Constitution and is applicable to the states. (*People v. Camacho* (2000) 23 Cal.4th 824, 829.) The touchstone of the Fourth Amendment is reasonableness. (*Riley v. California* (2014) ___ U.S.___ [134 S.Ct. 2473, 2482].) A warrantless search is unreasonable per se unless it falls within one of the "specifically established and well-delineated exceptions." (*Katz v. United States* (1967) 389 U.S. 347, 357; see also *People v. Baker* (2008) 164 Cal.App.4th 1152, 1156-1157; *People v. Chavez* (2008) 161 Cal.App.4th 1493, 1499.)

The U.S. Supreme Court points out that the Fourth Amendment " 'contains no provision expressly precluding the use of evidence obtained in violation of its commands.' " (*Herring*, *supra*, 555 U.S. at p. 139.) The court has nevertheless established a judicially-created remedy, the exclusionary rule, which is designed to safeguard Fourth Amendment rights generally through its deterrent effect. (*Id*. at p. 140.) When applicable, the exclusionary rule forbids the use of improperly obtained evidence at trial. (*Id*. at p. 139.)

Exclusion, however, is not a necessary consequence of a Fourth Amendment violation: "The fact that a Fourth Amendment violation occurred—*i.e.,* that a search or

12

arrest was unreasonable—does not necessarily mean that the exclusionary rule applies. [Citation.] Indeed, exclusion 'has always been our last resort, not our first impulse,' [citation], and our precedents establish important principles that constrain application of the exclusionary rule. [¶] First, the exclusionary rule is not an individual right and applies only where it ' "result[s] in appreciable deterrence." ' [Citations.] . . . Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future. [Citations.] [¶] In addition, the benefits of deterrence must outweigh the costs. [Citation.] 'We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence.' [Citation.] '[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.' " (*Herring*, *supra*, 555 U.S. at p. 141.)

In *Herring*, the court confronted the question of whether evidence should be suppressed where police personnel are responsible for an error, and held the "extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." (*Herring*, *supra*, 555 U.S. at p. 143.)[5] "To

---

5     *Herring* involved an officer's arrest and search incident to the arrest of a defendant who was found with a gun and drugs. (*Herring*, *supra*, 555 U.S. at p. 137.) The arresting officer had relied on a county warrant clerk's assertion that the defendant had an active arrest warrant. (*Id.* at p. 137.) The clerk based her assertion on another law enforcement employee's bookkeeping entry that falsely indicated the defendant had an active arrest warrant. (*Id.* at pp. 137-138, 145 ["this case . . . concern[s] false information provided by police"].) In holding that the good faith exception applied, the United States Supreme Court emphasized that not all recordkeeping errors were immune from the exclusionary rule (*id*. at p. 146), but it reasoned that "the conduct at issue was not so objectively

trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.  As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  (*Id*. at p. 144.)  However, "when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.' [Citation.]  In such a case, the criminal should not 'go free because the constable has blundered.' "  (*Id*. at pp. 147-148.)  In California, these principles have been applied to erroneous information provided to police by parole officers or a California Department of Corrections data entry clerk, who are considered adjuncts to the law enforcement team.  (*People v. Willis* (2002) 28 Cal.4th 22, 38-39; see *People v. Ferguson* (2003) 109 Cal.App.4th 367, 373-374.)

The good faith exception to the exclusionary rule does not apply if an officer does not act reasonably.  (*People v. Willis*, *supra*, 28 Cal.4th at p. 33.)  " '[T]he standard of reasonableness . . . is an objective one; [it] does not turn on the subjective good faith of individual officers.' "  (*Ibid*.; see also *United States v. Leon* (1984) 468 U.S. 897, 922-923.)  "Where . . . the prosecution invokes the good faith exception, the government has 'the burden . . . to prove that exclusion of the evidence is not necessary because of [that]

_____

culpable as to require exclusion."  (*Ibid*.)  Exclusion would be justified if police were "shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," but there was no evidence in that case that errors in the county's system were "routine or widespread" and neither clerk testified they could remember similar miscommunication ever happening on their watch. (*Id*. at pp. 146-147.)

14

exception.' [Citation.] Thus, 'the government has the burden of establishing "objectively reasonable" reliance' . . . . [Citation.] Establishing that the source of the error acted objectively reasonably is part of that burden." (*Willis*, 28 Cal.4th at pp. 36-37.)

C. *Substantial Evidence Supports Application of the Good Faith Exception*

As stated, the trial court found Dragasits was lawfully arrested for a felony that was supported by probable cause, and that the circumstances did not establish the type of objectively culpable, grossly negligent or egregious behavior on the part of the law enforcement personnel charged with collecting his DNA at the jail where Dragasits was housed. Assuming arguendo error occurred here, we hold that substantial evidence supports the court's finding that the error was merely negligent, and therefore exclusion would not deter the type of law enforcement mistake made in this case in that the benefit of suppressing the evidence " 'would be marginal or nonexistent.' " (See *Herring*, *supra*, 555 U.S. at pp. 138-139.)

Our conclusion is compelled in part by *Robinson*, *supra*, 47 Cal.4th 1104. In *Robinson*, the defendant's DNA profile within California's DNA database linked him to several felony sexual offenses. (*Robinson*, *supra*, 47 Cal.4th at pp. 1112-1113.) There was no dispute, however, that his DNA had been erroneously collected by local and state agencies in administering the DNA Act. (*Id*. at pp. 1113, 1116.) The law enforcement personnel who had taken his blood sample and entered it into the state data bank did so mistakenly believing the defendant had been convicted of a qualifying offense under the

15

DNA Act, when in fact he was not. (*Id*. at p. 1118.[6]) As a consequence, the defendant

argued the federal exclusionary rule was the appropriate remedy to apply to the unlawful

collection of his genetic material via the police personnel errors. (*Id*. at p. 1116.)

The California Supreme Court disagreed. (*Robinson*, *supra*, 47 Cal.4th at p.

1116.) Pointing out the California Constitution prohibited employing an exclusionary

rule that was more expansive than that articulated by the U.S. Supreme Court (*id*. at p.

1119), it concluded that the nonconsensual blood draw, though a state statutory violation

under the existing provisions DNA Act, did not violate the Fourth Amendment. (*Ibid*.)[7]

---

[6]     When the blood sample underwent a California Department of Justice
(Department) nonstatutory verification process, a Department employee noticed that
defendant's conviction for spousal abuse was not a qualifying misdemeanor, but that
employee then mistakenly determined that the defendant had a qualifying prior juvenile
adjudication for assault with a deadly weapon. (*Robinson*, *supra*, 47 Cal.4th at pp. 1118-
1119.) As a result of that mistake, the blood sample was deemed to be qualified for
inclusion in the state database. (*Id*. at p. 1119.)

[7]     The court reasoned that while invasions of the body, including nonconsensual
blood extraction from an incarcerated felon, was a search entitled to the protection of the
Fourth Amendment, the ultimate measure of the constitutionally of such a search under
the Fourth Amendment was reasonableness. (*Robinson*, *supra*, 47 Cal.4th at pp. 1119-
1120.) It pointed out that U.S. Supreme Court decisions had explained that an intrusion
caused by a blood test was commonplace and not significant, and that convicted criminals
did not enjoy the same expectation of privacy as nonconvicts. (*Id*. at p. 1120.) It agreed
with state appellate courts that had upheld the reasonableness of nonconsensual
extractions of biological samples from adult felons given the diminished expectation of
privacy, the minimal intrusion, and the fact the Act served compelling state interests
including the overwhelming public interest in prosecuting crimes accurately. (*Id*. at p.
1121.) *Robinson* held that the fact defendant's blood was collected in violation of
California law at the time did not change the Fourth Amendment analysis, because for
that purpose, it was not dispositive that a search and seizure was impermissible under
state law. (*Id*. at p. 1122 [" 'whether state law authorized the search [is] irrelevant' "].)
The relevant question was "whether, under all the circumstances, the nonconsensual
collection of DNA from a convicted felon is reasonable ' " 'judged by balancing its

16

The court further held that even assuming the nonconsensual extraction of the defendant's blood did violate the Fourth Amendment, the law enforcement personnel errors that led to the mistaken collection of that sample would not have triggered the federal exclusionary rule. (*Ibid.*)

On the latter point, the court stated: "[E]ven assuming, without deciding, that the state statutory violation that led to the nonconsensual extraction of defendant's blood . . . constituted a Fourth Amendment violation, application of the federal exclusionary rule would not be appropriate for such a violation." (*Robinson*, *supra*, 47 Cal.4th at p. 1124.) This was so because the exclusionary rule applies only " 'where its deterrence benefits outweigh its "substantial social costs," ' " and thus suppression of evidence " 'has always been [the court's] last resort.' " (*Id*. at p. 1124.) " '[T]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances, recurring or systematic negligence.' " (*Id*. at p. 1124, quoting *Herring*, *supra*, 555 U.S. at p. 136.)

In *Robinson*, the parties agreed that the Act's violations were unintentional mistakes made during early implementation of the Act, but characterized the acts differently, with the defendant contending in part that the mistakes were the result of a

intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " ' " (*Robinson*, 47 Cal.4th at p. 1123.) Because a lawfully convicted and incarcerated felon did not have a Fourth Amendment right to prevent state authorities from collecting a blood sample for DNA profiling, the court concluded defendant's sample was properly admitted into evidence at his trial. (*Ibid*.)

17

" 'cascading series of errors' that were 'indicative of a systemic breakdown.' " (*Robinson*, *supra*, 47 Cal.4th at p. 1125.) Focusing on whether the facts demonstrated deliberate, reckless or grossly negligent conduct, or recurring or systemic negligence, the court held the mistakes did not rise to that level. (*Id*. at p. 1126.) Substantial evidence supported the trial court's finding that the mistakes leading to the unlawful collection were made because correctional staff was under pressure to immediately implement a newly enacted law that was complex and confusing; that the motivation for the collection of the March 2, 1999 blood sample was a good faith belief, possibly based on a negligent analysis by another individual, that the defendant was a qualified offender; and that the Department, though it did not act in a " 'perfect manner,' " acted responsibly and conscientiously in " 'trying to keep [its] errors to a very low level.' " (*Robinson*, at p. 1126.) The *Robinson* court agreed that "the law enforcement personnel errors in this case were the result of negligence, 'rather than systematic error or reckless disregard of constitutional requirements,' that the unlawful collection of genetic material under the Act was not 'sufficiently deliberate that exclusion can meaningfully deter it,' and that the law enforcement personnel were not sufficiently culpable that such deterrence is worth the price paid by the justice system." (*Id*. at p. 1129.) Thus, the challenged errors did not by themselves " 'require the "extreme sanction of exclusion." ' " (*Ibid*., quoting *Herring*, *supra*, 555 U.S. at p. 140.)

In this case, county jail personnel responsible for taking Dragasits's DNA relied on a list generated from booking records reflecting an inmate's charges; in this case, the list showed Dragasits was arrested for a felony violation of Vehicle Code section 23110, an

18

offense for which a probable cause determination had already been made. Changes to the booking data were known to occur but, as Deputy Kirkpatrick stated, mistakes in taking DNA were rarely made. There is no evidence she or those officers charged with DNA collection made a conscious or deliberate effort to avoid checking the database before swabbing the inmates on their list, or otherwise acted recklessly in conducting their duties. " 'Gross negligence' long has been defined . . . as either a 'want of even scant care' or 'an extreme departure from the ordinary standard of conduct.' " (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754.) The jail personnel may well have been negligent in failing to check the booking summary updates through the course of the day. But this is not enough. (*Herring*, *supra*, 555 U.S. at p. 140 [negligent error "is not enough by itself to require 'the extreme sanction of exclusion' "].)

Nor is there evidence that DNA collection errors at the jail were "widespread," or symptomatic of a system that routinely led to such errors. (See *Herring*, *supra*, 555 U.S. at pp. 146-147.) In *Herring*, the court indicated that grave concern might arise " '[i]f a *widespread pattern* of violations were shown.' " (*Ibid*., quoting *Hudson v. Michigan* (2006) 547 U.S. 586, 604.) Accordingly, nothing permits an inference that jail personnel's reliance on the early-morning booking reports was objectively unreasonable or that officers who relied on those reports were reckless because the system was prone to error. Rather, the evidence permits a reasonable inference Deputy Kirkpatrick and the other personnel did not act in reckless disregard of constitutional requirements, and they relied in good faith on the information they had received from their supervisor. Because Dragasits did not show the type of systemic error that would raise grave concern, or

19

sufficiently culpable or egregious misconduct such that exclusion would meaningfully deter it, the exclusionary rule does not apply. The trial court did not err in denying Dragasits's motion to suppress the evidence.

## II. *Claim of Failure to Preserve Evidence*

During the investigation, investigators had the eleven shell casings found along the freeway swabbed for contact DNA; one swab was used for one group of five casings, and another swab was used for a second group of six casings. Only one of the swabs had human DNA on it to generate a profile. Because the swab was entirely consumed during the DNA testing process, Dragasits moved to dismiss his charges on grounds the destruction of the evidence denied him due process. The court denied the motion, ruling Dragasits had not shown the consumed DNA had known exculpatory value, and he did not show bad faith on the part of police in having all of the DNA consumed as part of their investigation.

Dragasits contends he was denied due process when investigators authorized DNA analysts to consume all of the DNA swabbed from the shell casings for testing, leaving no DNA remaining when his defense counsel requested retesting of the samples. Dragasits concedes that no due process violation occurs when evidence in the prosecution's possession is destroyed because the prosecution finds it necessary to consume the evidence in order to test it. (See *People v. Griffin* (1988) 46 Cal.3d 1011, 1021 (*Griffin*) ["The prosecution must be allowed to investigate and prosecute crime, and due process does not require that it forego investigation in order to avoid destroying potentially exculpatory evidence"]; *Arizona v. Youngblood* (1988) 488 U.S. 51, 57.) He

20

argues that the circumstances of his case falls outside these principles, because when the district attorney investigator gave permission to consume the entire sample, the evidence "was as likely to be exculpatory as inculpatory" and, unlike in *Griffin*, the government did not assert or show that destruction of the entire sample was necessary in order to process it.

Under *California v. Trombetta* (1984) 467 U.S. 479, " '[l]aw enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence "that might be expected to play a significant role in the suspect's defense." ' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1246, quoting *Trombetta*, at p. 488.) California has adopted this standard. (See *ibid*.; *People v. Beeler* (1995) 9 Cal.4th 953, 976, abrogated on another ground in *People v. Pearson* (2013) 56 Cal.4th 393, 462.) " 'To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." [Citations.] The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." [Citation.] In such case, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." ' " (*Carter*, at p. 1246.)

A finding as to "whether evidence was destroyed in good faith or bad faith is essentially factual: therefore, the proper standard of review is substantial evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 831.) Thus, on our review, " 'we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling.' " (*People v. Carter*, *supra*, 36 Cal.4th at p. 1246; see *People v. Beeler*, *supra*, 9 Cal.4th at p. 976.)

Apparently conceding he cannot show the exculpatory value of his DNA was apparent to law enforcement before it was entirely consumed, Dragasits urges us to treat DNA evidence differently from other kinds of physical evidence under the above principles. He argues that the value of an unanalyzed DNA sample is never known, and can never be apparent before its analysis, and thus to preserve his constitutional rights we should presume its exculpatory value. We decline to extend *Trombetta*'s principles of constitutional materiality as Dragasits proposes, when the high court made clear that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a *significant role* in the suspect's defense." (*California v. Trombetta*, *supra*, 467 U.S. at p. 488, italics added; *People v. Cook* (2007) 40 Cal.4th 1334, 1349 [defendant must show evidence *actually* contained possibly exculpatory evidence]; *People v. Houston* (2005) 130 Cal.App.4th 279, 302 [applying these principles in a case involving DNA analysis on a bullet].) " 'Due process does not impose upon law enforcement "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." ' " (*People v. Duff* (2014) 58 Cal.4th 527, 549.)

22

The mere possibility that an item might help the defense does not establish "materiality" in the constitutional sense. (*People v. Fauber* (1992) 2 Cal.4th 792, 829.)

Here, Dragasits points to no evidence that at the time the investigator authorized the forensic DNA analyst to consume all of the DNA on the swabs, or at the time the analyst tested the shell casings, either could have known whether or to what extent the DNA on the swabs matched Dragasits's DNA.[8] In other words, there is no evidence indicating that the officer or analyst had any more knowledge than that the DNA material, if any, on the shell casings was potentially exculpatory—that it was "evidentiary material of which no more can be said than that it *could have* been subjected to tests, the results of which *might have* exonerated the defendant." (*Arizona v. Youngblood*, *supra*, 488 U.S. at p. 57, italics added; see also *People v. Duff*, *supra*, 58 Cal.4th at p. 549.) It is not enough, as Dragasits argues, that the investigation by that time had focused on Dragasits, investigators having learned of his earlier February 2011 rock-throwing incident. Thus, in this case "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause . . . necessarily turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood*, at pp. 56-57; *People v. Beeler*, *supra*, 9 Cal.4th at p. 1000.) A due process violation only occurs under these circumstances when the state actor is aware that the evidence could

_____

[8]     Indeed the evidence was that the forensic DNA analyst had never to her knowledge tested anything containing Dragasits's DNA, that she was unaware that the sheriff's crime lab had ever conducted such tests to develop a DNA profile of Dragasits, and she was not aware that Dragasits was a suspect in the case when she conducted her analysis.

form a basis for exonerating the defendant and fails to preserve it as part of a conscious effort to circumvent its constitutional discovery obligation. (*California v. Trombetta*, *supra*, 467 U.S. at p. 488; *Beeler*, at p. 1000; *People v. Zapien* (1993) 4 Cal.4th 929, 964.) Negligent failure to preserve potentially exculpatory evidence, without evidence of bad faith, will not give rise to a due process violation. (*Youngblood*, at p. 58.)

Dragasits further suggests that in order to avoid a due process violation, the People should have presented evidence showing it was actually necessary to consume the entire DNA sample to run the tests; he maintains the forensic DNA analyst's testimony did not rise to this level but rather expressed a "rationale of convenience" instead of necessity. He states the analyst's "belief it might be better to consume the whole sample falls short of necessity," and "unless the government is required to show actual necessity, there is no practical limit to police discretion to authorize destruction of all but the largest DNA samples." The question in these circumstances, however, under *California v. Trombetta*, *supra*, 467 U.S. 479 and *Griffin*, *supra*, 46 Cal.3d 1101, is whether the analyst's decision to consume the entire DNA sample in her testing was in any way done in bad faith, as opposed to "in furtherance of the state's legitimate interests in examining the [casings] in the course of the police investigation." (*People v. Houston*, *supra*, 130 Cal.App.4th at p. 303.) In *Houston*, a forensic biologist conducted an examination that digested all of the DNA from a bullet for DNA testing after consulting with a firearms expert. (*Id*. at pp. 302-303.) The appellate court rejected the appellant's contention that the biologist "acted improperly because she 'made no attempt to find an alternative to total consumption of the sample other than consulting with a firearms expert, who presumably was not well

24

versed in DNA testing and solutions to her problem' " and that the appellant " 'was foreclosed from determining the reliability of the extraction process itself' " notwithstanding the availability of some extracted DNA for testing.  (*Id*. at p. 303.)  The Court of Appeal, citing *Griffin*, *supra*, 46 Cal.3d at p. 1022, held the biologist's "lack of action by itself . . . does not indicate bad faith, which is an essential element to appellant's claim."  (*Ibid*.)  Absent evidence that the biologist "deliberately avoided finding ways to partially consume the biological material, or that any method in fact exists that would have allowed her to partially consume the biological material on the bullet," there was no bad faith.  (*Houston*, at p. 303.)

Here, when cross-examined as to why she asked for permission to consume the entire swab, the DNA analyst stated, "Typically we will ask for permission when we are consuming, because then there will [be] no additional for defense testing.  But the main reason why I asked permission to consume is the more—if you have touch DNA or little amounts of DNA, the more you analyze, the more likely you will be able to generate a DNA profile off of that item."  On redirect, she explained further that "if I take the whole swab, I'm more likely to get a profile that has been on that swab versus taking half, risking the DNA was not on that half, it was on the other half, or there was a little on one half or a little on the other half and the sample falls below our detection limits or other lower limit."  She further testified that if it was possible to obtain a DNA profile and not consume an entire sample, it was her practice not to do so:  "[Prosecutor:]  If you believe it possible to still obtain a DNA profile and not consume an entire sample, is that your practice?  [¶]  [Analyst:]  Yes, it is.  So if I had a huge blood stain right here on this piece

25

of paper, I know that blood is going to generate an automatic profile, so I'm not going to take the whole stain, that would give me way too much.  So I would just take a small cutting, because I don't need to consume the entire item or the entire stain."

Contrary to Dragasits's contention, the analyst's testimony demonstrates that given the small amounts of DNA she expected on the casings and her usual practices, it was indeed necessary for her to consume all of the DNA.  And, there is no showing she deliberately avoided finding some way to only partially consume the material or failed to use another method that would have preserved some of it.  Under the circumstances, Dragasits has not shown any law enforcement personnel made a "conscious effort to suppress exculpatory evidence" (*California v. Trombetta*, *supra*, 467 U.S. at p. 488; *People v. Zapien*, *supra*, 4 Cal.4th at p. 965) or took other acts in bad faith.  There was no due process violation.

III.  *Claim of Instructional Error*

Dragasits contends that if the People's consumption of all of the DNA sample is not a constitutional violation, the court nevertheless prejudicially erred by refusing his proposed pinpoint instruction stating:  "The prosecution has introduced evidence of the results of scientific testing of a _____ *<e.g., blood>* sample in this case.  That ___ sample was entirely consumed by that scientific testing.  There was nothing improper about the fact that the sample was entirely consumed in this testing, but this fact does mean that the defendant did not have the opportunity to have separate and independent testing of a portion of the sample accomplished in order to determine whether such independent testing would yield the same result or a different result.  You are entitled to consider this

26

lack of opportunity for independent testing by the defendant in deciding how much weight, if any, to give to the evidence introduced by the prosecution."

Our high court has held that in the absence of bad faith on the part of law enforcement in failing to preserve evidence, a trial court need not instruct the jury regarding inferences that may be drawn in a defendant's favor or against the prosecution. (*People v. Cook*, *supra*, 40 Cal.4th at p. 1351; *People v. Farnam* (2002) 28 Cal.4th 107, 166-167.) Because we have concluded substantial evidence supports the trial court's finding as to the absence of bad faith conduct by law enforcement, the court did not err in refusing Dragasits's proposed instruction.

IV. *Correction of Abstract of Judgment*

Dragasits contends that the abstract of judgment does not accurately reflect the number of presentence custody credits awarded by the sentencing court; he points out the court awarded 815 days of actual credit for time served with an additional 122 days of conduct credits, for a total of 937 days of credit. The People concede the error, and agree the abstract of judgment should be modified to correct the error. We agree the abstract of judgment, which erroneously reflects 815 days of "total credits," and 122 days of "actual" time served, does not reflect the court's oral pronouncement. We order the abstract of judgment be corrected accordingly.

27

DISPOSITION

The judgment is modified to award Stephen Joseph Dragasits 815 days of actual credit and 122 days of conduct credits for a total of 937 days presentence custody credit. The superior court is directed to modify the abstract of judgment accordingly and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.


O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.

28